**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

---

**SUSAN ROY**, on behalf of herself and all others
similarly situated,

                                Plaintiff,

                v.

**ESL FEDERAL CREDIT UNION**,

                                Defendant.

Civil Action No. 19-cv-6122
(FPG/MWP)

---

**DEFENDANT ESL FEDERAL CREDIT UNION'S MEMORANDUM OF LAW IN
SUPPORT OF MOTION TO DISMISS FIRST AMENDED COMPLAINT**

**NIXON PEABODY LLP**
Richard A. McGuirk
1300 Clinton Square
Rochester, New York 14604
(585) 263-1000
rmcguirk@nixonpeabody.com

**KATTEN MUCHIN ROSENMAN LLP**
Stuart M. Richter, Esq. *(pro hac vice)*
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
stuart.richter@katten.com

*Attorneys for ESL Federal Credit Union*

## <u>TABLE OF CONTENTS</u>

**Page**

INTRODUCTION ............................................................................................................1

FACTUAL AND PROCEDURAL BACKGROUND.......................................................3

    I.      Plaintiff's Allegations ..........................................................................3

    II.     The Membership Agreement .................................................................5

LEGAL STANDARD.......................................................................................................7

ARGUMENT ....................................................................................................................8

    I.      Plaintiff Fails To State A Claim For Breach Of Contract Because The Plain Language Of The Contract Permits The Challenged Fees ...........................8

          A.     ESL Did Not Breach The Parties' Agreement By Assessing A $37 "Overdraft/Insufficient Funds" Fee For Transactions Declined For Insufficient Funds. ...........................................................................9

          B.     ESL Did Not Breach The Parties' Agreement By Assessing An Overdraft/Insufficient Funds Fee for Each Item Presented Against Insufficient Available Funds.............................................................11

          C.     The Membership Agreement Does Not Require ESL To Use The Ledger Balance To Assess Overdraft Fees. ................................13

    II.     Plaintiff's Implied Covenant Claim Is Fatally Deficient ......................17

    III.    Plaintiff's GBL § 349 Claim Fails As A Matter of Law .......................18

    IV.    Plaintiff's Claims Are Preempted By Federal Law ..............................19

CONCLUSION...............................................................................................................20

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Am. Rock Salt Co., LLC v. Norfolk S. Corp.*,
    180 F. Supp. 2d 420 (W.D.N.Y. 2001) ................................................................7

*BAT, LLC v. TD Bank, N.A.*,
    No. 15CV5839RRMCLP, 2018 WL 4693644 (E.D.N.Y. Sept. 28, 2018) ............................17

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ................................................................7, 8

*Canstar v. J.A. Jones Constr. Co.*,
    212 A.D.2d 452 (1st Dep't 1995) ................................................................18

*Cosmocom, Inc. v. Marconi Communications Intern. Ltd.*,
    261 F. Supp. 2d 179 (E.D.N.Y. 2003) ................................................................10

*Dalton v. Educ. Testing Serv.*,
    87 N.Y.2d 384 (1995) ................................................................17

*Domann v. Summit Credit Union*,
    No. 18-cv-167, 2018 WL 4374076 (W.D. Wis. Sept. 13, 2018) ........................2, 3, 14, 16, 17

*End Line Inv'rs, Ltd. v. Wells Fargo Bank, N.A.*,
    No. 16 CIV. 7009 (PGG), 2018 WL 3231649 (S.D.N.Y. Feb. 27, 2018) ..............................17

*Fink v. Time Warner Cable*,
    714 F.3d 739 (2d Cir. 2013) ................................................................18

*Flack v. Friends of Queen Catherine Inc.*,
    139 F. Supp. 2d 526 (S.D.N.Y. 2001) ................................................................8

*General Motors Corp. v. Villa Marin Chevrolet, Inc.*,
    2000 WL 271965 (E.D.N.Y. Mar. 7, 2000) ................................................................10, 15

*Gutierrez v. Wells Fargo Bank, N.A.*,
    704 F.3d 712 (9th Cir. 2012) ................................................................19, 20

*Hall v. Earthlink Network. Inc.*,
    396 F.3d 500 (2d Cir. 2005) ................................................................17

*In re Residential Capital, LLC*,
    531 B.R. 25 (S.D.N.Y. 2015) ................................................................8

*Ingeniera y Representaciones Internacionales, S.A. v. Stone & Webster Int'l Projects Corp.*,
  No. 96 CIV. 7335, 1997 WL 529015 (S.D.N.Y. Aug. 25, 1997) ............................................7

*Int'l Techs. Mktg., Inc. v. Verint Sys., Ltd.*,
  157 F. Supp. 3d 352 (S.D.N.Y. 2016)....................................................................8, 9, 17, 18

*JA Apparel Corp. v. Abboud*,
  586 F.3d 390 (2d Cir. 2009)............................................................................................8

*Lambert v. Navy Fed. Credit Union*,
  No. 19-cv-103, 2019 WL 3843064 (E.D. Va. Aug. 14, 2019) ...............................2, 13, 19, 20

*Law Debenture Trust Co. of New York v. Maverick Tube Corp.*,
  595 F.3d 458 (2nd Cir. 2010)........................................................................................15

*LJL 33rd St. Assoc., LLC v. Pitcairn Props., Inc.*,
  725 F.3d 184 (2d Cir. 2013)...........................................................................................17

*Lossia v. Flagstar Bancorp, Inc.*,
  895 F.3d 423 (6th Cir. 2018) .................................................................................4, 5, 12

*Maniolos v. United States*,
  741 F. Supp. 2d 555 (S.D.N.Y. 2010), *aff'd*, 469 F. App'x 56 (2d Cir. 2012).........................8

*Matusovsky v. Merrill Lynch*,
  186 F. Supp. 2d 397 (S.D.N.Y. 2002)................................................................................5

*Nelson v. MillerCoors*,
  LLC, 246 F. Supp. 3d 666 (E.D.N.Y. 2017) ......................................................................18

*Podpeskar v. Dannon Co., Inc.*,
  2017 WL 6001845 (S.D.N.Y. Dec. 3, 2017) ......................................................................18

*Rounds v. Beacon Assoc. Mgmt. Corp.*,
  09 Civ. 6910, 2009 WL 4857622 (S.D.N.Y. Dec. 14, 2009)...................................................8

*Scott v. Rochester Gas & Elec.*,
  333 F. Supp. 3d 273 (W.D.N.Y. 2018) ...............................................................................7

*Spagnola v. Chubb*,
  574 F.3d 64 (2d Cir. 2009)...........................................................................................19

*State v. United Parcel Service, Inc.*,
  253 F. Supp. 3d 583 (S.D.N.Y. 2017)..............................................................................8, 9

*Symquest Grp., Inc. v. Canon U.S.A., Inc.*,
  186 F. Supp. 3d 257 (E.D.N.Y. 2016) .................................................................5, 8, 17, 18

*Whittington v. Mobiloil Fed. Credit Union*,
  2017 WL 6988193 (E.D. Tex. Sept. 14, 2017) ................................................................19, 20

**Statutes**

New York General Business Law § 349 ............................................................................4, 18, 19

**Other Authorities**

https://www.paypal.com/us/webapps/mpp/ua/useragreement-full#payment-
  method (last visited Oct. 30, 2019) ........................................................................................4, 12

## **INTRODUCTION**

This case concerns two fees ESL Federal Credit Union ("ESL") assesses its members. Plaintiff Susan Roy mischaracterizes the nature of the transactions and the language of the parties' agreement to conjure a supposed breach of contract concerning both of those fees. Her claims fail because her made-up interpretation of the parties' agreement is contrary to its express language and is inconsistent with the parties' course of dealing and the longstanding practices by ESL and hundreds of other banks and credit unions.

Specifically, Plaintiff claims ESL breached the ESL Savings and Checking Disclosure Terms and Account Agreement (hereafter the "Membership Agreement") in three ways. *First*, Plaintiff contends ESL improperly charged a $37 "Overdraft/Insufficient Funds" fee rather than a $10 "Returned Item" fee when it declined transactions for insufficient funds. That claim fails because the parties' agreement expressly states that the $37 fee applies to returned *debits* or *payments*, explaining that "*an Overdraft/Insufficient Funds fee* will be charged by ESL for each 'insufficient funds' item presented for payment and *returned unpaid on a share draft account*." First Amended Complaint ("FAC"), Ex. 2 at 13 (emphases added). The $10 "Returned Item" fee applies to attempted *deposits* that are returned because a deposited check bounces.

*Second*, Plaintiff challenges ESL's practice of assessing an Overdraft/Insufficient Funds fee on the second Automated Clearing House ("ACH") transaction a merchant submits if the first ACH transaction was rejected for insufficient funds. Contrary to her allegations, Plaintiff does not and cannot point to any language in the parties' agreement precluding ESL from assessing an Overdraft/Insufficient Funds fee merely because a fee was charged when a first debit transaction was presented (and rejected) for payment. In fact, the plain language of the parties' agreement expressly permits ESL to assess a fee *each time* a merchant presents a transaction for payment against insufficient funds: "an Overdraft/Insufficient Funds fee will be charged by ESL for *each*

'insufficient funds' item presented for payment and returned unpaid on a share draft account."
*Id.* (emphasis added).  The Court need not (and should not) assume Plaintiff's legal conclusion
or idiosyncratic interpretation of the parties' contract that each ACH initiated is the same "item."
Indeed, the Eastern District of Virginia recently rejected the identical theory Plaintiff advances
and granted a credit union's motion to dismiss.  *Lambert v. Navy Fed. Credit Union*, No. 19-cv-
103, 2019 WL 3843064 (E.D. Va. Aug. 14, 2019).  This Court should do the same.

*Third*, Plaintiff challenges ESL's practice of using members' "available" balances to
determine when overdrafts occur.  As one court explained, "[f]inancial institutions primarily use
two methods to calculate an account holder's checking account balance:  the 'ledger' balance and
the 'available' balance.'"  *Domann v. Summit Credit Union*, No. 18-cv-167, 2018 WL 4374076,
at *1 (W.D. Wis. Sept. 13, 2018).  The so-called "ledger" balance (also sometimes referred to as
the "actual" balance) refers to the full amount of all deposits into a member's account, less
payments that have actually been posted (or processed).  *Id.* (citing CFPB, Winter 2015
Supervisory Highlights, Section 2.3.2) ("[a] ledger-balance method factors in only settled
transactions in calculating an account's balance").  By contrast, "[a]n available-balance method
calculates an account's balance based on electronic transactions that the institutions have
authorized (and therefore are obligated to pay) but not yet settled, along with settled
transactions."  *Id.*  It "also reflects holds on deposits that have not yet cleared."  *Id.*

Plaintiff does not allege that using the available balance is illegal (because it is not).
Rather, she contends that the parties' contract supposedly requires the credit union to use the
ledger or actual balance method to assess overdraft fees.  But none of the relevant documents
even mentions the "ledger" or "actual" balance, much less require that ESL must use that balance
to assess overdraft and insufficient funds fees.  Instead, the parties' agreement makes crystal

2

clear that funds may be withdrawn (and therefore not overdrawn) only if they are "available" – *i.e.*, they do not exceed the "available" balance.  Notably, two district courts have dismissed identical claims, concluding that similar language in a credit union member agreement "makes clear that not every dollar [*i.e.*, the ledger balance] in a customer's account is immediately 'available' for withdrawal."  *Domann*, WL 4374076 at \*6-8; *Chambers v. NASA Fed.l Credit Union*, 222 F. Supp. 3d 1, 11-12 (D.D.C. 2016).  While other courts have allowed breach of contract claims past the pleading stage, the contracts here – like those in the better-reasoned *Domann* and *Chambers* decisions – cannot plausibly be construed to require ESL to use the "ledger" balance method – a balance not even mentioned in the contract – to assess overdrafts.

Because Plaintiff's remaining claims for breach of the covenant of good faith and fair dealing and violation of New York's consumer protection law are premised on her deficient breach-of-contract allegations, they too fail as a matter of law. This Court should accordingly dismiss the FAC in its entirety.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.   Plaintiff's Allegations

ESL is a federally charted credit union headquartered in New York. FAC ¶ 27.  ESL is owned by its members; any profit, including profit from fees, is returned to its members in the form of low interest rates on loans, high dividends on share accounts, and improvements in ESL's products and services.  *Id.*, Ex. 2 at 9.  Like most financial institutions, ESL's contracts with its members allow it to assess fees when a transaction is attempted on a member's account, but that member's account does not have sufficient funds to cover it.  *Id.* ¶ 7. Plaintiff Susan Roy is a citizen of New York and has a personal share draft (checking) account with ESL.  *Id.* ¶ 26.

Plaintiff originally filed this putative class action on February 15, 2019. On October 7, 2019, she filed the FAC, which asserts two claims for relief:  (1) breach of contract and the

implied covenant of good faith and fair dealing; and (2) violation of the New York General Business Law § 349 ("N.Y. GBL § 349"). *Id.* ¶¶ 75-86 and 87-93. Both claims rest on the theory that ESL breached the parties' contract in three ways: (1) by charging the $37 Overdraft/Insufficient Funds fee for transactions declined for insufficient funds rather than the $10 Returned Item fee (*id*. ¶¶ 2, 41-44); (2) by charging Overdraft/Insufficient Funds fees on transactions that are presented for payment against insufficient funds if such fees have been charged on previous attempts to collect payment (*id*. ¶¶ 2-3, 45-50); and (3) by using the available balance rather than the ledger balance to determine whether a transaction will overdraw an account (*id*. ¶¶ 2, 5, 7, 60-65).

Specifically, Plaintiff alleges that on November 23, 2018, ESL rejected a $34.93 transfer to PayPal via an ACH transaction due to insufficient funds and charged Plaintiff a $37 Overdraft/Insufficient Funds fee. *Id.* ¶¶ 31-38. Plaintiff further claims that on November 29, 2018 and December 31, 2018, she was improperly charged two additional $37 fees when PayPal initiated two more ACHs that were returned for insufficient funds. *Id.* Plaintiff omits that by providing her share draft account number to PayPal, she authorized PayPal to "try to transfer again if the initial transfer is rejected by your bank." *See* https://www.paypal.com/us/webapps/mpp/ua/useragreement-full#payment-method (last visited Oct. 30, 2019); *see also Lossia v. Flagstar Bancorp, Inc.*, 895 F.3d 423, 426-27 (6th Cir. 2018) ("By providing his account number and routing number to an online merchant, [plaintiff] authorized the merchant (Originator) to initiate the ACH transaction. Then the merchant's bank introduced the transaction to the ACH Network by sending the transaction to the Federal Reserve (the ACH Operator), which in turn forwarded the transactions to the Receiver's bank (Flagstar) so that [plaintiff's] account could be debited.").

Plaintiff also alleges that ESL charged her a $37 Overdraft/Insufficient Funds fee on October 21, 2016 for a loan payment of $293.22 and another such fee on October 10, 2017 for a credit card payment of $43.00 "even though her account never went negative and always had sufficient funds to cover the transaction."  FAC ¶¶ 66-67.

## II.    The Membership Agreement

The Membership Agreement allows ESL to assess a fee whenever a credit union member attempts a transaction but does not have available funds to cover it.  *Id.*, Ex. 2, at 13.[1] Specifically, the Membership Agreement's "Courtesy Pay" provision informs members that ESL "may pay checks or other items/transactions ('item') or ('items'), which would cause your share draft account to have a negative (or further negative) balance (herein 'overdraft')."  *Id.*  The Agreement goes on to explain that:

> [a]n Overdraft/Insufficient Funds fee will be charged to your share draft account, in accordance with our Fee Schedule, for each overdraft Item that is cleared on your share draft account.  In addition, an Overdraft/Insufficient Funds fee will be charged by ESL for each "nonsufficient funds" (NSF) item presented for payment and returned unpaid on a share draft account.

*Id.* Thus, if payment of an item "would cause" a member's account to result in an overdraft, ESL may either pay the item or decline it, but in either case it may charge an "Overdraft/Insufficient Funds fee."

ESL's Fee Schedule provides that the "Overdraft/Insufficient Funds" fee is $37.  *Id.* ¶ 37 & Ex. 1 at 3.  The Fee Schedule also provides a $10 fee for "Returned Items."  *Id.*  The Returned

---

[1] Because Plaintiff attaches a copy of both the ESL Membership Agreement and the Fee Schedule to the FAC, the documents are properly considered on a motion to dismiss.  *See Matusovsky v. Merrill Lynch*, 186 F. Supp. 2d 397, 400 (S.D.N.Y. 2002) (on a motion to dismiss, "a court may consider documents attached to the complaint as exhibits, or incorporated by reference, as well as any documents that are integral to, or explicitly referenced in, the pleading."); *Symquest Grp., Inc. v. Canon U.S.A., Inc.*, 186 F. Supp. 3d 257, 264 (E.D.N.Y. 2016) (same).

Item fee applies to checks that are deposited in a member's account and then returned by ESL for lack of payment.  *See id.*, Ex. 2 at 11 (explaining that funds will not be available for withdrawal if members "deposit a check that has been returned unpaid").

The Membership Agreement provides that ESL will use the "available" balance to determine whether a member's funds are sufficient to pay a transaction.  Specifically, it states:

> ESL will not pay a check when funds *are not available to cover it*, and an overdraft fee will be assessed (refer to a Fee Schedule for the exact fee charged).  We are only required to make one determination of the account balance.  If that determination reveals *insufficient available funds to pay the check or other item* and you have requested CheckOK, unless prohibited by law and in our sole discretion, . . . we may honor checks, ESL Bill Pay transactions and reoccurring ACH debit transactions drawn on insufficient funds pursuant to our Courtesy Pay agreement (refer to the Courtesy Pay Section in this Agreement).

*Id.*, Ex. 2 at 8 (emphases added).

Similarly, ESL's Electronic Funds Transfer Disclosure Statement and Agreement (the "EFT Agreement") explains that deposits, withdrawals and transfers are subject to the "availability of funds" and that the amounts of pending debit card authorizations are "unavailable for withdrawal" until they "clear" a member's account:

> **POSTING AND TIMING OF TRANSACTIONS AND DOCUMENTATION OF TRANSACTIONS**
>
> **ESL ATM Card, ESL Visa Check Card & ESL Visa HSA Card** Any transfer of funds accomplished through the use of an ATM to or from an account will be credited conditionally and subject to verification as to *the availability of funds*.  No deposit or payment of funds shall be considered final until ESL has verified and processed the transaction.  Withdrawals, deposits, and transfers of funds will be posted to your account at ESL immediately.
>
> ATM deposits made at ESL ATMs are immediately posted to your ESL account, but *may not be immediately available for withdrawal*.  In some *cases*, funds *will be unavailable for withdrawal* until the second business day following an ATM deposit.  This time frame may vary, however, depending on the verification of the contents of the ATM deposit envelope.
>
> **ESL Visa Check Card & ESL Visa HSA Card** The amount of authorized purchases made with your ESL Visa Check Card or ESL Visa HSA Card at *Visa*

6

merchant locations will be made immediately *unavailable for withdrawal* from your designated ESL Checking Account or ESL HSA for up to two full business days following the date you performed the transactions.  Most Visa purchase transactions will clear your designated ESL Checking Account or *ESL* HSA in one to two business days, but some Visa purchase transactions (especially those performed at Visa merchants not electronically connected to Visa) may take longer, even weeks.

You remain liable for the full amount of any Visa purchases made with your ESL Visa Check Card / ESL Visa HSA Card regardless of how long the *purchase* transaction takes to clear your designated ESL Checking Account/ESL HSA and regardless of the balance in your account at the time the transaction clears.

Declaration of Kim Smith, dated Nov. 7, 2019 ("Smith Decl."), Ex. 1 at 10-11 (emphases added).[2]  In other words, the EFT Agreement defines "available funds" as synonymous with available balance. *See Domann*, 2018 WL 4374076 at *1 (describing available balance as all deposits less deposit holds and debit card authorization holds).

## LEGAL STANDARD

To survive a Rule 12(b)(6) motion to dismiss, a complaint must give "fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  The allegations in the complaint must be sufficient to raise the possibility of relief

---

[2] Because ESL's EFT Agreement is part of the agreements that govern Plaintiff's account, it must be read in conjunction with the Membership Agreement.  *See* Smith Decl., Ex. 1 at 3 ("This agreement is a supplement to certain other share account agreements which you have already entered into with ESL.  It supplements those accounts which you and ESL have agreed will be accessed by one of the above services.").  In addition, because the document is integral to the claims set forth in the FAC, it is properly considered on a motion to dismiss.  *See Scott v. Rochester Gas & Elec.*, 333 F. Supp. 3d 273, 277 (W.D.N.Y. 2018) ("[e]ven where a document is not incorporated by reference, the court may nevertheless consider it where the complaint relies heavily upon its terms and effect, which renders the document integral to the complaint") (internal quotation marks and citations omitted); *see also Am. Rock Salt Co., LLC v. Norfolk S. Corp.*, 180 F. Supp. 2d 420, 423-24 (W.D.N.Y. 2001) (in an action for breach of contract, the contract itself is generally to be considered a part of the pleadings, and may be considered on a Rule 12(b)(6) motion); *Ingeniera y Representaciones Internacionales, S.A. v. Stone & Webster Int'l Projects Corp.*, No. 96 CIV. 7335, 1997 WL 529015, at *1 (S.D.N.Y. Aug. 25, 1997).  Exhibit 1 to the Smith Declaration consists of the 2016, 2017, and 2018 EFT Agreements. The relevant language in each agreement is substantially the same; the page citations are to the 2018 EFT Agreement.

above the "speculative level." *Id.* Dismissal for failure to state a claim under Rule 12(b)(6) is proper "when the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Id.* at 558.

## ARGUMENT

### I.   Plaintiff Fails To State A Claim For Breach Of Contract Because The Plain Language Of The Contract Permits The Challenged Fees

Under New York law, "the initial interpretation of a contract is a matter of law for the court to decide." *Maniolos v. United States*, 741 F. Supp. 2d 555, 566 (S.D.N.Y. 2010), *aff'd*, 469 Fed. Appx. 56 (2d Cir. 2012) (internal quotation marks and citation omitted). This "interpretation" includes "whether or not the terms of the contract are ambiguous." *Symquest Grp., Inc. v. Canon U.S.A., Inc.*, 186 F. Supp. 3d 257, 263 (E.D.N.Y. 2016); *see also JA Apparel Corp. v. Abboud*, 586 F.3d 390, 396 (2d Cir. 2009) (recognizing that "the question of whether a written contract is ambiguous is a question of law for the court").

"Where a contract's language is clear and unambiguous, a court may dismiss a breach of contract claim on a Rule 12(b)(6) motion to dismiss." *Symquest Grp.,* 186 F. Supp. 3d at 263 (internal quotation marks and citations omitted); *see also State v. United Parcel Service, Inc.*, 253 F. Supp. 3d 583, 658 (S.D.N.Y. 2017) ("[w]hen an agreement is unambiguous on its face, it must be enforced according to the plain meaning of its terms") (citations omitted); *In re Residential Capital, LLC*, 531 B.R. 25, 42 (S.D.N.Y. 2015) (same); *Rounds v. Beacon Assoc. Mgmt. Corp.*, 09 Civ. 6910, 2009 WL 4857622 at *3 (S.D.N.Y. Dec. 14, 2009) (same). Where a contractual term is clear and unambiguous, a court may neither rewrite the term under the guise of interpretation nor "redraft the contract to accord with its instinct for the dispensation of equity upon the facts of a given case." *Flack v. Friends of Queen Catherine Inc.*, 139 F. Supp. 2d 526, 536 (S.D.N.Y. 2001) (citations omitted). In determining whether a provision is ambiguous, the

provision must be read "in the context of the entire agreement." *Int'l Techs. Mktg., Inc. v. Verint Sys., Ltd.*, 157 F. Supp. 3d 352, 362 (S.D.N.Y. 2016) (internal quotation marks and citation omitted); *see also State v. United Parcel Service, Inc.*, 253 F. Supp. 3d 583, 658 (S.D.N.Y. 2017) ("all provisions of a contract be read together as a harmonious whole") (internal quotation marks and citation omitted). "If the document as a whole 'makes clear the parties' over-all intention' courts examining isolated provisions should choose that construction which will carry out the plain purpose and object of the agreement." *Int'l Techs.*, 157 F. Supp. 3d at 362 (internal quotation marks and citation omitted).

Plaintiff cannot sustain a claim for breach of contract for the simple reason that ESL's actions were consistent with the terms of the Membership Agreement. Plaintiff alleges that ESL breached the Membership Agreement by (1) charging the $37 Overdraft/Insufficient Funds fee for transactions declined as a result of insufficient funds; (2) charging multiple Overdraft/Insufficient Funds fees on what Plaintiff contends are "the same transactions"; and (3) by using the "available" balance rather than the "ledger" or "actual" balance to assess overdrafts. As shown below, Plaintiff's allegations fail to state a breach of contract because when read as a whole, the Membership Agreement and related documents clearly authorize all of the challenged fees.

A.    ESL Did Not Breach The Parties' Agreement By Assessing A $37 "Overdraft/Insufficient Funds" Fee For Transactions Declined For Insufficient Funds.

Contrary to Plaintiff's contention, ESL did not breach the parties' agreement by charging the $37 "Overdraft/*Insufficient Funds*" fee instead of the $10 "Returned Item" fee for transactions declined for *insufficient funds*. *See* FAC ¶¶ 41-43. Although both fees are set forth in the ESL Fee Schedule, the Membership Agreement makes clear that the Overdraft/Insufficient Funds fee applies to transactions that exceed a member's available funds. That is true regardless

of whether ESL pays the item or "returns" the item "unpaid":

> An Overdraft/Insufficient Funds fee will be charged to your share draft account, in accordance with our Fee Schedule, for each overdraft Item that is cleared on your share draft account.  In addition, *an Overdraft/Insufficient Funds fee* will be charged by ESL for each "insufficient funds" item presented for payment and *returned unpaid* on a share draft account.

FAC, Ex. 2 at 13 (emphases added). Accordingly, when the Fee Schedule is read together with the Membership Agreement (as it must be), the $37 "Overdraft/Insufficient Funds" fee set forth in the Fee Schedule (*id.*, Ex. 1 at 3) matches the identical term used in the Membership Agreement and therefore must be construed to apply to payment transactions that are returned due to insufficient funds.

By contrast, the "Returned Item" fee is an entirely different animal; indeed, it is a different term than the one used in the Membership Agreement for attempted payments returned for insufficient funds. It applies to the situation where a deposited item (like a check) is returned because it does not clear.  *See id.*, Ex. 2 at 6 (distinguishing "deposited item[s]" that are "returned unpaid" from the situation where "an account is overdrawn"). While Plaintiff asserts that the "Returned Item" language is "ambiguous" (*id.* ¶ 44), that is not true when the language is read (as it must be) in light of the entire agreement. *See Cosmocom, Inc. v. Marconi Communications Intern. Ltd.*, 261 F. Supp. 2d 179, 187 (E.D.N.Y. 2003) ("where two seemingly conflicting contract provisions can be reconciled, a court is required to do so and give both effect") (internal quotation marks and citation omitted); *General Motors Corp. v. Villa Marin Chevrolet, Inc.*, 2000 WL 271965, at *11 (E.D.N.Y. Mar. 7, 2000) (courts must "attempt to reconcile provisions to avoid any inconsistency") (citations omitted). Construing the "Returned Item" fee to apply to deposited items that are returned and the "Overdraft/Insufficient Funds" fee to apply to items declined for insufficient funds is the only plausible interpretation that gives "full meaning and effect to all of [the contract's] provisions." *Int'l Techs.*, 157 F. Supp. 3d at

362-64 (citation omitted)). Accordingly, Plaintiff's claim that ESL breached the contract by assessing the $37 Overdraft/Insufficient Funds fee on items returned for insufficient funds should be dismissed as a matter of law.

> B.   **ESL Did Not Breach The Parties' Agreement By Assessing An Overdraft/Insufficient Funds Fee for Each Item Presented Against Insufficient Available Funds.**

Plaintiff also claims that ESL breached the parties' contract by assessing more than one Overdraft/Insufficient Funds fee (what Plaintiff refers to as a "RI Fee") on what Plaintiff nakedly concludes, without any apparent justification or support, is "a single transaction." *See* FAC ¶ 49 (the Membership Agreement "make[s] clear that ESL did not authorize itself to charge multiple RI Fees on a single transaction"); *id.* ¶ 45 ("ESL's Fee Schedule indicates that only a single RI Fee will be assessed per 'item' that is returned due to insufficient funds."); *id.* ¶ 50 ("ESL promises that one $10 RI Fee will be assessed per item, "check or other withdrawal," and these terms must mean all iterations of the same instruction for payment.  As such, ESL breached the contract when it charged more than one RI Fee per item.").

Plaintiff's claim once again contradicts the plain language of the parties' contract.  Even assuming Plaintiff is correct that an item is the "same" item no matter how many different ACH transactions are initiated for a payment (which she is not), the Membership Agreement nowhere states that only one fee may be charged "per item" no matter how many times a third-party merchant submits presents a transaction for payment. Indeed, the Membership Agreement states the opposite, explaining that "an Overdraft/Insufficient Funds fee will be charged by ESL *for each 'insufficient funds' item presented for payment and returned unpaid* on a share draft account." *Id.*, Ex. 2 at 13 (emphasis added).  In other words, each time an item is "presented for payment and returned unpaid" it is subject to a fee. No matter how much Plaintiff wishes it did, the Membership Agreement does not say that an Overdraft/Insufficient Funds fee may be

charged only the first time a payee submits an ACH for payment.  While Plaintiff would like the Membership Agreement to prohibit fees on what she calls the "same item" (no matter how many times a subsequent ACH is presented and rejected), that is simply not what the Agreement says. What is more, Plaintiff's suggestion that fees are assessed on the "same" transaction is erroneous:  each time a merchant submits an item for payment, it is a new transaction.[3]

The fact that Plaintiff "took no action to resubmit" the items for payment (*id.* ¶ 46) makes no difference. In this case, PayPal initiated a second ACH for the payment after its first ACH was returned. *Id.* ¶¶ 31-38.  Under most third-party agreements, consumers authorize the merchant to seek payment multiple times, subject to rules that allow third parties to initiate a second transaction in an attempt to get paid (for checks) and up to a third transaction to get paid (for ACHs).  *See*  https://www.paypal.com/us/webapps/mpp/ua/useragreement-full#payment-method (last visited Oct. 30, 2019) (authorizing PayPal to "try to transfer again if the initial transfer is rejected by your bank"); *see also* Federal Reserve Banks, *Operating Circular No. 3: Collection of Cash Items and Returned Checks* § 3.1(a) (Jan. 1, 2019) (checks); National Automated Clearing House (NACHA) Rule § 2.12.4.1 (ACHs).  Plaintiff agreed that ESL can "honor" these transactions."  *See* FAC, Ex. 2, at 7 ("If you voluntarily give information about your account (such as the credit union's routing number or your account number) to a third party, . . . ESL will honor such debits"); *id.* at 9 (agreeing the NACHA Rules govern the parties' relationship).  Since 2015, NACHA has required that merchants code the second and third transactions "retry."  Accordingly, contrary to Plaintiff's suggestion that ESL is at fault for

---

[3]  *See Lossia*, 895 F.3d at 427 n.2 (explaining that ACH transactions involve the following "sequence of events":  "the merchants [through their banks) initiate[] the transactions by sending them to the Federal Reserve, which in turn forward[] the transactions to [the credit union or bank] for processing").

assessing fees for "retry transactions," in fact, such fees are a common, regulated feature of the banking industry.

Indeed, the Eastern District of Virginia recently dismissed Plaintiff's exact claim in identical circumstances.  *See Lambert*, 2019 WL 3843064.  Specifically, the *Lambert* court rejected the plaintiff's argument that "two ACH debit requests made by the same merchant, in the same amount, for the same purpose, are the same 'debit item.'"  *Id*. at *3.  The court instead agreed with the credit union's interpretation of the parties' contract.  Similar to the provision at issue here, the parties' contract provided "'[a] fee may be assessed . . . for each returned debit item.'"  *Id*.  The *Lambert* court dismissed the breach of contract claim because the "contract unambiguously provide[d] that 'each' time Navy Federal Credit Union 'returns' a request for payment (a 'debit item') for insufficient funds, a nonsufficient fund fee may be assessed without regards to whether the returned debit item was a re-presentment of a previously rejected request."  *Id*. at *5.  ESL's language is even better than Navy Federal's; accordingly, the Court should dismiss this theory as well.

Accordingly, ESL did not breach the parties' agreement by assessing Overdraft/Insufficient Funds fee each time an item is presented against insufficient funds.

> ## C.   *The Membership Agreement Does Not Require ESL To Use The Ledger Balance To Assess Overdraft Fees.*

Finally, Plaintiff claims that ESL breached the Membership Agreement by failing to determine overdrafts based on what she calls the "actual" or "ledger" balance – *i.e.*, all of the money in the account, "without deductions for pending debit card transactions or holds on deposits."  FAC ¶¶ 63-65.  For support, she myopically relies on the Membership Agreement's statement "that ESL will only charge OD Fees on transactions 'which would cause [members'] share draft account to have a negative (or further negative) balance,'" and ignores the rest of the

Membership Agreement where it defines a negative balance as insufficient available funds and defines what constitutes available funds. *Id.* ¶ 61. According to Plaintiff, "negative" balance must mean "ledger" rather than "available" balance – although she never explains why. Instead, she merely asserts that "it is reasonable for [her] and accountholders like her to interpret and understand ESL's use of the term 'balance' as the official balance in the account *i.e.* the actual money in the account without deductions for pending debit card transactions or holds on deposits." *Id.* ¶ 65.

In fact, Plaintiff's interpretation of the Agreement is entirely unreasonable. While Plaintiff stresses that "the Account Agreement does not define 'balance'" (*id.*¶ 9), the Agreement makes clear that "balance" means "available" balance by using the term "available" to modify the words "balance" and "funds" numerous times throughout the Agreement and defining what available funds are (deposits less deposit holds and debit-card authorizations). *See Id.*, Ex. 2 at 8 ("ESL will not pay a check when funds *are not available to cover it*, and an overdraft fee will be assessed (refer to a Fee Schedule for the exact fee charged).") (emphasis added); *id*. (if a "determination of the account balance . . . reveals *insufficient available funds to pay the check or other item* . . . we may honor checks, ESL Bill Pay transactions and reoccurring ACH debit transactions drawn on insufficient funds pursuant to our Courtesy Pay agreement") (emphasis added); Smith Decl., Ex. 1 at 10-11.[4] Available funds, by definition, means a subset of

---

[4] *See also* FAC, Ex. 2 at 13 (courtesy pay will be extended only if "Your share draft account is brought to a positive end-of-day *available balance* at least once every 20 days") (emphasis added); *id*. at 6 (explaining with respect to simple spending accounts "Overdraft options are not available on this account. Any ATM, POS, ACH or Visa Check Card transaction initiated for an amount over your *available* account balance may be declined.") (emphasis added); *id*. at 11 (explaining that certain internal subaccounts maintained on the books by ESL "will not affect your *available* balance") (emphasis added); Smith Decl., Ex. 1 at 10 ("[a]ny transfer of

"funds."  The only way to interpret the Membership Agreement the way Plaintiff posits would be to ignore the word available, violating the cardinal rule of contract interpretation.  *See Domann*, 2018 WL 4374076 at *6 ("If this term meant 'all of the funds' in the member's account, as [plaintiff] urges, then the adjective 'available' would be meaningless and unnecessary.").

ESL's Funds Availability Policy also defines when deposits are available, contravening Plaintiff's "ledger" balance theory by making clear that "all the money in an account" – *i.e.*, the "actual' balance – is not available for withdrawal for members.  *See* FAC, Ex. 2 at 11-12 (explaining how much of and when deposits will be "available" for withdrawal by members).  If, as Plaintiff claims, ESL may not consider the funds on hold when determining an overdraft, ESL's Funds Availability Policy is rendered a nullity because the holds on deposits will have no impact on whether a member may spend the full amount without overdrawing.

An example is illustrative:  If a member makes a $10,000 deposit with an out-of-state check at an ATM, the Membership Agreement provides that generally only the first $200 will be immediately available (unless certain conditions are met).  *See id.*, Ex. 2, at 11.  Assuming no other funds in her account, the member's available balance would then be $200 and her actual or ledger balance would be $10,000 until the deposit hold is released (*i.e.*, the check proves to be good).  According to Plaintiff (and in contradiction to ESL's Funds Availability Policy), the member may write a check the full $10,000 immediately without overdrawing and incurring an Overdraft/Insufficient Funds fee despite $9,800.00 of that deposit not being available.  Because Plaintiff's interpretation nullifies an essential component of the Membership Agreement, it must be rejected as a matter of law. *See Law Debenture Trust Co. of New York v. Maverick Tube*

---

funds  accomplished  through  the  use  of  an  ATM  to  or  from  an  account  will  be  credited conditionally and subject to verification as to *the availability of funds*").

*Corp.*, 595 F.3d 458, 468 (2nd Cir. 2010) (courts must "safeguard against adopting an interpretation that would render any individual provision superfluous"); *General Motors Corp.*, 2000 WL 271965 at *11 ("agreement must be construed to accord a meaning and purpose to each of its parts" and to avoid "an interpretation which renders a clause absolutely meaningless") (internal quotation marks and citations omitted).

If there were any remaining doubt as to whether the parties intended overdrafts to be determined on the basis of the "available" funds rather than the "actual" funds in a member's account (and there is none), the EFT Agreement confirms that funds may be withdrawn (and therefore not overdrawn) only if they do not exceed the "available" balance. Specifically, the Agreement explains that ATM deposits "may not be immediately available for withdrawal" and "[i]n some cases, funds will be unavailable for withdrawal until the second business day following an ATM deposit." *See* Smith Decl., Ex. 1 at 10.  In addition, the EFT Agreement explains that funds placed on hold to account for pending debit card transactions will not be immediately "available" for withdrawal. *See id.* (explaining that "[t]he amount of authorized purchases" members make with their debit cards "will be made immediately unavailable for withdrawal" from their checking accounts for up to two full business days following the transactions (*i.e.*, the time that transactions typically take to "clear")). By informing members that the amount of ATM deposits as well as "[t]he amount of authorized purchases" made with their debit cards will not be immediately "available" for withdrawal, the EFT Agreement informs members that ESL uses the "available" balance not the ledger balance for purposes of determining whether a transaction will overdraw an account.  *See Domann*, 2018 WL 4374076 at *1 (explaining that the "available" balance excludes "holds on deposits that have not yet cleared" as well as holds for "electronic transactions that the institutions have authorized (and therefore

16

are obligated to pay) but not yet settled").  Thus, Plaintiff's assertion that ESL never explained that "it would deduct pending debit card transactions for purposes of determining a 'negative account balance'" (FAC ¶ 78) is demonstrably false; it explained to members they could only spend their available funds, spending more than that would overdraw their account, and defined available funds to include deposit holds and debit-card authorization holds.

Because her interpretation ignores ESL's multiple uses of the term "available," the EFT Agreement, and the Funds Availability Policy, Plaintiff has not (and cannot) show that the parties' agreement "as written reasonably can be understood as a promise by [ESL] to use a member's actual or 'ledger' balance when assessing overdraft fees."  *Domann*, 2018 WL 4374076 at *8; *accord Chambers*, 222 F. Supp. 3d at 11-12.

## II.    Plaintiff's Implied Covenant Claim Is Fatally Deficient

Plaintiff's claim for breach of the covenant of good faith and fair dealing also cannot stand.  To state a claim for breach of the covenant, a party must allege facts showing that defendant sought to prevent performance of a contract or to withhold contract benefits from the plaintiff.  *BAT, LLC v. TD Bank, N.A.*, No. 15CV5839RRMCLP, 2018 WL 4693644, at *11 (E.D.N.Y. Sept. 28, 2018).  However, the covenant "cannot be construed so broadly as effectively to nullify other express terms of a contract, or to create independent contractual rights."  *End Line Inv'rs, Ltd. v. Wells Fargo Bank, N.A.*, No. 16 CIV. 7009 (PGG), 2018 WL 3231649, at *8 (S.D.N.Y. Feb. 27, 2018).  Because the parties' agreement expressly permits ESL to charge the challenged fees, ESL's assessment of such fees cannot constitute a breach of the implied covenant.  *See LJL 33rd St. Assoc., LLC v. Pitcairn Props., Inc.*, 725 F.3d 184, 195 (2d Cir. 2013) ("[T]he implied covenant of good faith cannot create duties that negate explicit rights under a contract."); *Symquest Grp.*, 186 F. Supp. 3d at 266 (a party's "exercise of its legitimate

contractual rights cannot have breached any implied duty") (citation omitted); *Int'l Techs.*, 157 F. Supp. 3d at 362 (a party cannot use the implied covenant to "add to the contract a substantive provision not included by the parties") (citations omitted); *Dalton v. Educ. Testing Serv.*, 87 N.Y.2d 384, 389 (1995) (the covenant cannot be used to imply an obligation inconsistent with other terms of a contractual relationship).

Moreover, Plaintiff's breach of the covenant of good faith and fair dealing fails because it is duplicative of her contract claim. *See Hall v. Earthlink Network. Inc.*, 396 F.3d 500, 508 (2d Cir. 2005); *Int'l Techns.,* 157 F. Supp. 3d at 368-70 (a plaintiff must "base its implied covenant theory on allegations that are distinct from the factual predicate for its contract claims") (citation omitted); *Symquest Grp.*, 186 F. Supp. 3d at 265 ("when a complaint alleges both a breach of contract and a breach of the implied covenant of good faith and fair dealing based on the same facts, the latter claim should be dismissed as redundant") (internal quotation marks and citation omitted); *Canstar v. J.A. Jones Constr. Co.*, 212 A.D.2d 452, 453 (1st Dep't 1995) (dismissing good faith claim as "intrinsically tied to the damages allegedly resulting from a breach of contract"). Here, Plaintiff bases her implied covenant claim on the same predicate facts and alleged damages as her breach of contract claim. *See* FAC ¶¶ 81, 83. Accordingly, the former claim fails as a matter of law.

## III.   Plaintiff's GBL § 349 Claim Fails As A Matter of Law

Plaintiff's N.Y. GBL § 349 claim is deficiently pled as well. "To establish a prima facie case under Section 349, a plaintiff must demonstrate that '(1) the defendant's deceptive acts were directed at consumers, (2) the acts are misleading in a material way, and (3) the plaintiff has been injured as a result.'" *Nelson v. MillerCoors*, LLC, 246 F. Supp. 3d 666, 673-74 (E.D.N.Y. 2017). In this case, Plaintiff's N.Y. GBL § 349 claim rests on the same allegations as her breach of

contract claim. *See* FAC ¶ 90. Because ESL's overdraft/insufficient funds practices are permitted by the plain language of the contract, Plaintiff does not (and cannot) make a plausible allegation that a reasonable consumer would be deceived by them. *See Fink v. Time Warner Cable*, 714 F.3d 739, 741 (2d Cir. 2013); *Podpeskar v. Dannon Co., Inc.*, 2017 WL 6001845 at *3 (S.D.N.Y. Dec. 3, 2017).

Even assuming Plaintiff properly alleged that she was misled by ESL's practices (which she did not), she has not pled the monetary loss requirement under N.Y. GBL § 349, which requires a loss independent of the loss caused by the alleged breach of contract. *See Spagnola v. Chubb*, 574 F.3d 64, 66-73 (2d Cir. 2009) ("[A]lthough a monetary loss is a sufficient injury to satisfy the requirement under § 349, that loss must be independent of the loss caused by the alleged breach of contract."). In this case, Plaintiff's N.Y. GBL § 349 claim merely reasserts her breach of contract claim. FAC ¶ 90. Because Plaintiff's complained of loss is the same as her alleged breach of contract loss, the FAC fails to state a violation of the N.Y. GBL § 349 as a matter of law. *Id.*

## IV.   Plaintiff's Claims Are Preempted By Federal Law

Finally, Plaintiff's claims should be dismissed on the ground that at bottom she is seeking to hold a federally chartered credit union liable for allegedly failing to adequately disclose its overdraft and insufficient funds practices. "The requirement to make particular disclosures falls squarely within the purview of federal banking regulation and is expressly preempted." *Gutierrez v. Wells Fargo Bank, N.A.*, 704 F.3d 712, 725 (9th Cir. 2012). In this case, Plaintiff's contract and N.Y. GBL § 349 claims both boil down to an attack on the sufficiency of ESL's contract disclosures. *See, e.g.*, FAC ¶ 59 ("ESL provides no such disclosure, and in so doing, deceives its accountholders."). To the extent they are based on a failure to disclose, those claims

are preempted as a matter of law. *See Lambert*, 2019 WL 3843064 at *2 (state law claims purporting to dictate credit union overdraft disclosures, including the very same multiple insufficient funds claim asserted by Plaintiff here, are preempted); *Whittington v. Mobiloil Fed. Credit Union*, 2017 WL 6988193, at *11 (E.D. Tex. Sept. 14, 2017), *aff'd*, 2019 WL 5198474 (5th Cir. Oct. 15, 2019) (concluding that plaintiff's fraud claims were "preempted by TISA to the extent they are rooted in [the credit union's] alleged failure to disclose certain information governed by TISA's disclosure requirements"); *Gutierrez*, 704 F.3d at 725 (state law claims regarding a national bank's failure to disclose certain overdraft fee practices were preempted).

Likewise, to the extent Plaintiff is suggesting that ESL's overdraft/insufficient funds practices are "unfair," those claims too are preempted.  *See Gutierrez*, 704 F.3d at 725-26 (concluding that the National Banking Act preempted state law consumer protection claims for "unfair" or "unconscionable" practices by banks); *Lambert*, 2019 WL 3843064 at *3 ("To the extent Plaintiff challenges a perceived failure to disclose, the specific language used in the disclosure, *or the fairness of the [NSF] fee practice itself* . . . those arguments are clearly preempted.") (emphasis added); *Whittington*, 2017 WL 6988193 at *9 (holding plaintiff's deceptive trade practices claims preempted as a "de facto regulation of the activities outlined in [federal banking law]").

<u>**CONCLUSION**</u>

For the foregoing reasons, ESL respectfully requests that the Court dismiss the First Amended Complaint in its entirety with prejudice.

Dated:  November 7, 2019

                                                     **NIXON PEABODY LLP**

                                                     By:  s/ Richard A. McGuirk
                                                     Richard A. McGuirk
                                                     1300 Clinton Square
                                                     Rochester, New York 14604
                                                     (585) 263-1000
                                                     rmcguirk@nixonpeabody.com

                                                     Stuart M. Richter, Esq. *(pro hac vice)*
                                                   **Katten Muchin Rosenman LLP**
                                                   2029 Century Park East, Suite 2600
                                                     Los Angeles, CA 90067-3012
                                                     stuart.richter@katten.com

                                                   *Attorneys for ESL Federal Credit Union*