## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NEW YORK

**SUSAN ROY**, on behalf of herself
and all others similarly situated,

                              Plaintiff,

        v.

**ESL FEDERAL CREDIT UNION**,
        Defendant.

Case No. 6:19-cv-06122

## PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................1

SUMMARY OF ALLEGATIONS ...............................................................................1

LEGAL STANDARD .................................................................................................2

ARGUMENT ..............................................................................................................3

    I.    Ms. Roy Has Sufficiently Alleged Two Separate Claims for Breach of Contract ........................3

        A.    ESL Breaches the Contract When It Charges OD Fees on
            Transactions that That Did Not Overdraw the Account .......................................4

        B.    ESL Is Barred from Charging More Than One Fee per Item .............................9

            1)    Ms. Roy's Interpretation of the Account Documents is Reasonable........................10

            2)    Banks Large and Small Use the Term "Item" in
                the Commonsense, Plain Way that Plaintiff Urges......................................12

            3)    NACHA Uses a Similar Term to "Item" But Applies It Like Ms. Roy Does..........13

            4)    Contractual Context and ESL's Own Bank Statements
                Indicate the Same Item Cannot Incur More Than One NSF or OD Fee...............14

            5)    The Account Documents State that ESL May Charge
                an RI Fee on Each Item, Not Each Time an Item is Processed..............................15

    II.    Ms. Roy Has Sufficiently Plead a Violation of the Covenant of
        Good Faith and Fair Dealing..........................................................................18

    III.    Ms. Roy States a Claim for Violation of GBL §349 ....................................20

    IV.    Ms. Roy's Claims Are Not Preempted ........................................................ 211

        A.    Ms. Roy's Breach of Contract Claim is Not Preempted ...................................24

        B.    Ms. Roy's GBL § 349 Claim is Not Preempted .................................................24

# TABLE OF AUTHORITIES

**Cases**

*511 W. 232nd Owners Corp. v. Jennifer Realty Co.*, 98 N.Y.2d 144, 153 (2002)...........................................18

*Aguayo v. U.S. Bank*, 653 F.3d 912, 925 (9th Cir. 2011) ......................................................................23

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ...............................................................................................2

*Baldanzi v. WFC Holdings Corp.*, No. 07-cv-9551-LTS, 2008 WL 4924987, at *2 (S.D.N.Y. Nov. 14, 2008) ...............................................................................................................................................23

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007) ...............................................................................2

*Binetti v. Wash. Mut. Bank*, 446 F. Supp. 2d 217, 218 (S.D.N.Y. 2006) ....................................................23

*Bruesewitz v. Wyeth LLC*, 562 U.S. 223, 251 n.2 (2011) ..........................................................................23

*Canstar v. J.A. Jones Const. Co.*, 622 N.Y.S.2d 730 (1995) ......................................................................20

*Carias ex rel. Matos v. Monsanto Co.*, No. 15-CV-3677-JMA, 2016 WL 6803780 (E.D.N.Y. Sept. 30, 2016) ...............................................................................................................................................21

*Chambers v. NASA Federal Credit Union*, 222 F. Supp. 3d 1, 10 (D.D.C. 2016) ..........................................7

*Chiste v. Hotels.com L.P.*, 756 F. Supp. 2d 382, 406 (S.D.N.Y. 2010) .......................................................21

*Claridge v. N. Am. Power & Gas, LLC*, No. 15-CV-1261 PKC, 2015 WL 5155934, at *6 (S.D.N.Y. Sept. 2, 2015) ..................................................................................................................................18

*Cox v. Spirit Airlines, Inc.*, 18-3484 (2d Cir. 2019) ....................................................................................4

*Cuomo v. Clearing House Ass'n, L.L.C.*, 557 U.S. 519, 532-33 (2009) .......................................................23

*Dalton v. Educ. Testing Serv.*, 87 N.Y.2d 384, 389 (1995) ........................................................................18

*Decohen v. Capital One, N.A.*, 703 F.3d 216, 222 (4th Cir. 2012) ............................................................23

*Donnenfeld v. Petro, Inc.*, 333 F. Supp. 3d 208, 224 (E.D.N.Y. 2018) .....................................................21

*Eastman Kodak Co. v. Altek Corp.*, 936 F. Supp. 2d 342, 351 (S.D.N.Y. 2013)........................................11

*Garcia v. UMB Bank NA*, No. 1916-CV01874 (Jackson Co. Mo. Circuit Court Oct. 18, 2019) ..........17

*Gold v. 29-15 Queens Plaza Realty, LLC*, 841 N.Y.S.2d 668, 669 (App. Div.) ...........................................21

*Goldman v. Simon Property Group, Inc.*, 869 N.Y.S.2d 125, 129-30 (2d Dep't 2008) ..................................20

*Gunter v. United Fed. Credit Union,* No. 3:15-cv-483-MMD, 2016 WL3457009, at *3 (D. Nev. June 26, 2016) ............................................................................................................................................. 3, 8, 17

*Gutierrez v. Wells Fargo Bank*, 704 F.3d 712, 727 (9th Cir. 2012).................................................. 23, 24

*Hall v. Earthlink Network, Inc.*, No. 98 CIV. 5489 (RO), 2003 WL 22990064, at *2 (S.D.N.Y. Dec. 19, 2003) ..........................................................................................................................................................19

*Hanjy v. Arvest Bank*, 94 F. Supp. 3d 1012, 1025 (E.D. Ark. 2015)..............................................24

*In re Checking Account Overdraft Litig.*, 694 F.Supp.2d 1302, 1325 (S.D. Fla. 2010) ..................20

*In re HSBC Bank, USA, N.A.*, 1 F. Supp. 3d 34, 46-48 (E.D.N.Y. 2014) ........................................ 23, 25

*In re HSBC*, 1 F. Supp. 3d at 48; *New Mexico v. Capital One Bank (USA) N.A.*, 980 F.Supp.2d 1314, 1333 (D.N.M. 2013) ............................................................................................................................24

*In re HSBC,* 694 F. Supp. 2d 1302, 1313 (S.D. Fla. 2010)...............................................................24

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*, No. 11-md-2262-NRB, 2015 WL 6696407, at *25 (S.D.N.Y. Nov. 3, 2015) .....................................................................................................................23

*In re TD Bank., N.A.*, 150 F. Supp. 3d 593, 622–25 (D.S.C. 2015) ....................................................... 8, 24

*Int'l Techs. Mktg., Inc. v. Verint Sys., Ltd.*, *157* F. Supp. 3d 352, 369 (S.D.N.Y. 2016). ...........................19

*King v. Carolina First Bank*, 26 F. Supp. 3d 510, 515, 517 (D.S.C. 2014)...............................................24

*Lambert v. Navy Federal Credit Union,* No. 19-cv-103-LO, 2019 WL 3843064 (E.D. Va. Aug. 14, 2019) .................................................................................................................................. 17, 18, 22, 25

*Law Debenture Tr. Co. of N.Y. v. Maverick Tube Corp.,* 595 F.3d 458, 466 (2d Cir. 2010) ..........................4

*Lloyd v. Navy Fed. Credit Union*, No. 17-cv-1280-BAS, 2018 WL 1757609, at *7 (S.D. Cal. April 12, 2018) ......................................................................................................................................................17

*M/A-COM Sec. Corp. v. Galesi*, 904 F.2d 134, 136 (2d Cir. 1990)..............................................................18

*Martinez v. Wells Fargo Home Mortg., Inc.*, 598 F.3d 549, 555 (9th Cir. 2010) ............................................23

*Metro. Life Ins. Co. v. RJR Nabisco, Inc.*, 906 F.2d 884, 889 (2d Cir. 1990)......................................................3

*Miller v. Wells Fargo Bank, N.A.*, 994 F. Supp. 2d 542, 552 (S.D.N.Y. 2014)............................................23

*Morris*, 2019 WL 1274928, at *2.............................................................................................................17

*Negrin v. Norwest Mortg., Inc.*, 700 N.Y.S.2d 184 (2d Dep't 1999)...................................................20

*Nick's Garage, Inc. v. Progressive Cas. Ins. Co.*, 875 F.3d 107 (2d Cir. 2017)..................................21

*Old Nat. Bank v. Kelly*, 31 N.E.3d 522, 528-31 (Ind. Ct. App. 2015) ........................................24

*People ex rel. Schneiderman v. Orbital Publ'g Grp.*, 21 N.Y.S.3d 573, 586 (N.Y. Sup. Ct. 2015)...............20

*Photopaint Techs., LLC v. Smartlens Corp.*, 335 F.3d 152, 160 (2d Cir. 2003)...................................3

*Pinkston-Poling v. Advia Credit Union*, 227 F. Supp. 3d 848 (E.D. Mich. 2016) ...............................3, 9, 17

*Ramirez v. Baxter Credit Union*, No. 16-cv-3765-SI, 2017 WL1064991, at *5 (N.D. Cal. Mar. 21, 2017) ................................................................................................................................... 3, 9

*Roberts v. Capital One Bank, N.A.*, 719 F. Appx. 33 (2d Cir. 2017) ............................................4

*Segovia v. Vitamin Shoppe, Inc.*, 14-CV-7061-NSR, 2017 WL 6398747, at *7 (S.D.N.Y. Dec. 12, 2017) ...........................................................................................................................................20

*Smallwood v. Sovereign Bank, F.S.B.*, No. 11-cv-87, 2012 WL 243744 (N.D. W.Va. Jan. 25, 2012) ........24

*Smith v. Bank of Hawaii*, 2017 WL 3597522, at *7 (D. Haw. Apr. 13, 2017) ..................................7

*Spagnola v. Chubb*, 574 F.3d 64, 66-73 (2d Cir. 2009)...............................................................21

*Stewart v. Riviana Foods Inc.*, No. 16-cv-6157-NSR, 2017 WL 4045952, at *4 (S.D.N.Y. Sept. 11, 2017) ...........................................................................................................................................23

*Symquest Grp., Inc. v. Canon U.S.A. Inc.*, 186 F. Supp. 3d 257, 266 (E.D.N.Y. 2016) ...........................20

*Tannehill v. Simmons Bank*, No. 3:19-cv-140-DPM (E.D. Ark. Oct. 21, 2019)................................17

*Tims v. LGE Community Credit Union*, 935 F.3d 1228 (11th Cir. 2019)....................................... 7, 8

*Tisdale v. Wilson Bank and Trust*, No. 19-400-BC (Davidson Co. Tenn. Chancery Court Oct. 17, 2019) ...........................................................................................................................................17

*Walker v. People's United Bank*, 305 F. Supp. 3d 365, 377-78 (D. Conn. 2018)................................23

*Watters v. Wachovia Bank, N.A.*, 550 U.S. 1, 11 (2007) .............................................................23

*Whittington v. Mogiloil Federal Credit Union*, No. 16-cv-482, 2017 WL 6988193 (E.D. Tex. Sept. 14, 2017) ............................................................................................................................................25

*Wodja v. Wash. State Emps. Credit Union*, 2016 WL 3218832, at *2-3 (W.D. Wa. June 9, 2016) ... 3, 9, 17

*Zink v. First Niagara Bank, N.A.*, 18 F. Supp. 3d 363, 369 (W.D.N.Y. 2014) .........................................23

**Other Authorities**

https://www.bankatfirst.com/content/dam/first-financial-bank/FFB_Terms_and_Conditions.pdf (last accessed September 20, 2019) ...........................................................................12

https://www.firstcitizens.com/personal/banking/deposit-agreement (last accessed Sept. 20, 2019) ................................................................................................................................................12

OCC Advisory Letter, GUIDANCE ON UNFAIR OR DECEPTIVE ACTS OR PRACTICES, 2002 WL 521380, at *2, *7 n. 2 (Mar. 22, 2002) ...............................................................25

**Rules**

2019 NACHA Operating Rules, Subsection 2.12.4.2 Formatting Requirements for Reinitiated Entries ................................................................................................................................. 13, 14

Fed. R. Civ. P. 8(a) ...................................................................................................................21

## INTRODUCTION

Plaintiff Susan Roy does not dispute that ESL Federal Credit Union ("ESL") was entitled to charge some Overdraft Fees ("OD Fees") and Returned Item Fees ("RI Fees"). She does dispute the number of such fees that ESL charged. ESL has improperly multiplied its OD Fees by using a manufactured account balance, and separately by charging more than one RI Fee on the same check or electronic item, when such items are reprocessed multiple times. These practices breach the contract and reasonable expectations of Ms. Roy and putative class members.

First, Ms. Roy's has properly alleged that ESL breached its contract both when OD Fees are assessed on accounts that were not actually negative and when it assesses multiple fees on the same item. Her OD Fee allegations are supported by the express language of the "Account Documents." Her multiple fee allegations are supported by the Account Documents, by the rules of NACHA (the payment network on which her attempted payments occurred) and by industry-standard terminology used by other credit unions and banks. Second, Ms. Roy's implied covenant claim is properly alleged, as it is asserted in the alternative based on ESL's improper exploitation of its contractual discretion. Third, Ms. Roy has properly alleged her GBL § 349 claims because ESL's reading of the Account Documents is incorrect, and Ms. Roy is permitted to bring this claim simultaneously. Finally, none of Ms. Roy's claims are preempted. Ms. Roy has alleged all of the elements of her claims and ESL's motion should be denied—just as similar motions have been in numerous other cases around the country.

## SUMMARY OF ALLEGATIONS

This action addresses two distinct practices: first, charging multiple $37 fees on the same item; and second, charging $37 OD Fees on transactions that did not actually overdraw the account. Amended Complaint ("ECF No. 30"), ECF No. 30 at ¶¶ 1–2. ESL's plain contract language prohibits these practices, which caused damages to Ms. Roy and similarly situated customers. *Id.* at ¶¶ 3–12, 20.

Between November 23, 2018 and December 31, 2018, ESL charged Ms. Roy $111 in RI Fees related to a single attempted $34.93 transfer to PayPal. *Id.* at ¶¶ 31–40. Ms. Roy understood the PayPal transaction to be a single item and took no steps to reinitiate or resubmit the payment. *Id.* ESL rejected the transaction due to insufficient funds on November 23, 2018, but then reprocessed it two more times on November 29, 2018 and December 31, 2018. *Id.* In each instance, ESL charged Ms. Roy an RI Fee. *Id.* ESL referred to each resubmission as "RETRY PYMT," indicating ESL understood these to be iterations of the same authorization for payment, not new items. *Id.*

Separately, ESL's contract states that OD Fees will only be charged "for each overdraft item." *Id.* at ¶ 62. "Overdraft" is defined as a negative account balance. *Id.* Instead of using the actual amount of money in a customer's account, ESL uses a manufactured balance that is not disclosed to consumers to increase the number of OD Fees it assesses. *Id.* at ¶¶ 63–65. Ms. Roy was charged OD Fees on October 21, 2016 and October 10, 2017, despite her account never going negative and having sufficient funds to cover the applicable transactions. *Id.* at ¶¶ 66–67.

ESL grants itself discretion to either charge, or not charge, both RI Fees and OD Fees. *Id.* at ¶¶ 68–74. Ms. Roy had a reasonable expectation that ESL would not charge multiple RI Fees on the same item and would not charge OD Fees when her account balance was not negative. *Id.*

## **LEGAL STANDARD**

The inquiry in a motion to dismiss is straightforward: A court must take all facts in the complaint as true (and make all reasonable inferences in favor of the plaintiffs), and determine whether the complaint states a plausible claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Courts need not determine that a plaintiff's victory is probable—only that the facts pled would, if true, entitle the plaintiff to relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007).

## ARGUMENT

### I.   Ms. Roy Has Sufficiently Alleged Two Separate Claims for Breach of Contract[1]

Ms. Roy sufficiently alleges that, in breach of its adhesion contract, (1) ESL improperly multiplied the OD Fees assessed against its customers by utilizing a balance other than the "account balance" it promised it would use, and (2) ESL improperly charged more than one fee on the same item. ESL argues the contract permits its challenged conduct, but the contract is at best ambiguous. Ms. Roy's interpretation of the contract is undoubtedly reasonable, which is all that is required to survive a motion to dismiss.

At the motion to dismiss stage, "[u]nder New York law… judgment as a matter of law is appropriate if the contract language is unambiguous." *Photopaint Techs., LLC v. Smartlens Corp.*, 335 F.3d 152, 160 (2d Cir. 2003). To find a contract is unambiguous, "a definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself, and concerning which there is no reasonable basis for a difference of opinion." *Metro. Life Ins. Co. v. RJR Nabisco, Inc.*, 906 F.2d 884, 889 (2d Cir. 1990). A bank account contract that "contain[s] no provision defining a key term in dispute . . . or that requires searching for 'contractual hints' scattered throughout the documents is open to two 'reasonable . . . interpretations'" cannot serve as the basis for dismissal. *Ramirez v. Baxter Credit Union*, No. 16-cv-3765-SI, 2017 WL1064991, at *5 (N.D. Cal. Mar. 21, 2017). When the consumer "offer[s] a plausible interpretation" of how the credit union agreed to assess fees, dismissal before discovery and factual development is improper. *Gunter v. United Fed. Credit Union,* No. 3:15-cv-483-MMD, 2016 WL3457009, at *3 (D. Nev. June 26, 2016).[2]

Ambiguities in a bank's descriptions of its fee practices in its account contract support claims

---

[1] Ms. Roy does not oppose ESL's Motion with respect to her claim that the credit union was only authorized to charged $10, as opposed to $37, for Returned Item Fees.

[2] *See also Pinkston-Poling v. Advia Credit Union*, 227 F. Supp. 3d 848 (E.D. Mich. 2016); *Gunter*, 2016 WL 3457009, at *2-3; *Wodja v. Wash. State Emps. Credit Union*, 2016 WL 3218832, at *2-3 (W.D. Wa. June 9, 2016).

for recovery of excessive fees at the motion to dismiss stage. In *Roberts v. Capital One Bank, N.A.*, 719 F. Appx. 33 (2d Cir. 2017), the Second Circuit reversed a dismissal order where its account agreement was ambiguous as to whether it could charge certain overdraft fees. Each party offered reasonable interpretations of Capital One's contract language, and at a minimum, the same is true here (although Ms. Roy disputes that ESL's interpretation is reasonable). The Second Circuit recently reiterated these bedrock contract interpretation principles in *Cox v. Spirit Airlines, Inc.*: "[a]n ambiguity exists where the terms of the contract could suggest more than one meaning when viewed objectively by a reasonably intelligent person . . . who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." 18-3484 (2d Cir. 2019) (citing *Law Debenture Tr. Co. of N.Y. v. Maverick Tube Corp.*, 595 F.3d 458, 466 (2d Cir. 2010)).

With respect to both claims, Ms. Roy has proffered plausible, reasonable interpretations of the Account Documents. Thus, the Motion must be denied.

### A. ESL Breaches the Contract When It Charges OD Fees on Transactions that That Did Not Overdraw the Account

Ms. Roy's allegation is simple: ESL promised to use the "account balance" to determine overdrafts and yet it charged OD Fees on transactions that did not overdraw the "account balance" as expressly reported by ESL on bank statements. There are four relevant provisions in the Account Documents, all of which expressly promise overdrafts will be determined on an "account balance"— a term which is undefined. The Deposit Agreement states:

> [W]e may pay checks or other items/transactions…**which would cause your share draft account to have a negative (or further negative) balance (herein "overdraft").**

> **[W]e shall not pay any item if your negative checking account balance is,** or if we were to make payment pursuant to this Agreement would become, greater than $500 in a Free Checking Account or $1,000 in a Premier Checking Account including any applicable fees.

> ESL will not pay a check when funds are not available to cover it, and an overdraft fee will be assessed (refer to a Fee Schedule for the exact fee charged). **We are only**

**required to make one determination of the account balance.**

ECF No. 30-1 (emphasis added).

Additionally, the Electronic Funds Transfer ("EFT") Agreement, ECF No. 31-2, uses a new term—"actual balance"—and indicates that it is the "actual balance" that is determinative of overdrafts (though it never defines what an "actual balance" is):

> Any ATM, POS, ESL Visa Check Card or ESL Visa HSA Card transaction that clears against insufficient funds in your account at ESL will result in an insufficient funds (NSF) fee for each transaction, regardless of the account balance indicated at the ATM, POS, or Visa terminal at the time you performed the transaction. Due to different computer updating processes, the account balance indicated at the ATM, POS, or Visa terminal may not always reflect the actual balance in your account at ESL.

All of this language repeatedly conveys that OD Fees will only be assessed when a withdrawal request actually overdraws the account balance. It says nothing about using some other balance— much less an "available balance"—to make an overdraft fee determination. The Account Documents (the EFT Agreement, Deposit Agreement and Fee Schedule) provide no answers to accountholders as to the definitions or calculations of the "account balance" or "actual balance." Ms. Roy's common-sense allegation is that the "account balance" or "actual balance" is the balance that appears on her statements, which reflects the amount of money actually in her account. That balance shows that her account was not overdrawn for certain transactions on which she was assessed OD Fees. That is sufficient to state a breach of contract.

While ESL pins its Motion on its analysis of "available balance" or "ledger balance," Ms. Roy's Complaint never uses those terms for the simple reason that they—much less their meaning or calculation—also never appear in the Account Documents. Thus, ESL's entire argument regarding the difference between the two balances must be disregarded as outside the four corners of the Complaint and the Account Documents. Indeed, ESL's focus on these terms merely confirms that Ms. Roy's interpretation of the Account Documents is reasonable, as according to ESL, one needs to understand these unincluded terms to reach the "correct" contract reading. Also outside the four

corners is how and why ESL determined the transactions at issue overdrew one or more of these balances. The *only* issue properly before the Court here is whether Ms. Roy has adequately alleged that her "account balance" was not overdrawn for certain transactions. She has.

ESL's main, albeit incorrect, argument is that the Account Documents don't use the phrase "ledger balance." But the Account Documents don't use "available balance" either. The point is that the contract, as described above, refers repeatedly to "account balance" without defining it. The term "account balance" simply cannot be turned on its head to mean a specialized, insider term like "available balance" when the contract never says so.

Nor is it relevant that ESL sprinkles the word "available" in the Account Documents. The language ESL selectively quotes does not convey that ESL uses an "available balance" method to determine overdrafts. It pays to closely analyze ESL's assertion that "the Agreement makes clear that 'balance' means 'available' balance by using the term 'available' to modify the words 'balance' and 'funds' numerous times throughout the Agreement and defining what available funds are." ECF No.  at 14. That assertion relies on a Deposit Agreement provision that says no such thing:

> 29. **ESL will not pay a check when funds are not available to cover it,** and an overdraft fee will be assessed (refer to a Fee Schedule for the exact fee charged). **We are only required to make one determination of the account balance. If that determination reveals insufficient available funds to pay the check or other item** and you have requested CheckOK, unless prohibited by law and in our sole discretion, we may honor the check or other item and transfer the amount of overdraft from your regular Daily Dividend, Premier Money Maker or Money Maker Account; or if we have previously approved a Cash Reserve Account that is attached to your share draft account, **we will honor checks drawn on insufficient funds** and add the amount of the overdraft to your Cash Reserve Account up to your approved credit limit; or, we may honor checks, ESL Bill Pay transactions and reoccurring ACH debit transactions **drawn on insufficient funds** pursuant to our Courtesy Pay agreement (refer to the Courtesy Pay Section in this Agreement). ESL is not required to send you prior notice before a check is **returned for insufficient funds**.

*Id.* Contrary to ESL's argument, these provisions never "make clear" that "balance means available balance." To the contrary, the first sentence ("ESL will not pay a check when funds are not available to cover it") uses "available" as a verb, not a noun. There are also three separate references to

"insufficient funds" without the qualifier "available," plus another reference to the "account balance." While there is a single reference to the term "insufficient available funds," the paragraph (like the document as a whole), never states what that means, or how that might be different from "account balance" of "insufficient funds."

A nearly identical circumstance applied in a case recently decided by the Eleventh Circuit, *Tims v. LGE Community Credit Union*, 935 F.3d 1228 (11th Cir. 2019), which alleged LGE Community Credit Union breached its contract when charging overdraft fees based on the "available balance"—which took into account pending debits—rather than "ledger balance," which did not. *Id.* at 1233–34. The Eleventh Circuit reversed the dismissal and held that the contract was ambiguous as to which balance—"ledger" or "available"—would be used to assess overdraft fees. The LGE account agreement, like ESL's, ambiguously referred to situations in which "an item is presented without sufficient funds in your account to pay it" or when "funds are not available to pay" items presented for payment. *Id.* at 1236. And—directly rebutting ESL's identical argument—the fact that the account agreement explained that some *deposits* might not be immediately available, the court held, "did not explain that a pending debit would render funds unavailable to consumers." *Id.* at 1239.

While ESL suggests this case is akin to *Chambers v. NASA Federal Credit Union*, 222 F. Supp. 3d 1, 10 (D.D.C. 2016), in reality, it is analogous to *Tims* and *Smith v. Bank of Hawaii*, No. 16-00513 JMS-RLP, 2017 WL 3597522, at *7 (D. Haw. Apr. 13, 2017). Unlike the agreement in *Chambers*, which had an entire section titled "Available Balances to Make Transactions" that detailed how such a balance worked, ESL's agreement is silent, leaving ESL to point to a few sparse, random references to the word "available." As in *Bank of Hawaii*, ESL's account documents do not define "available" when describing account balances. 2017 WL 3597522, at *7. Like Bank of Hawaii, ESL "apparently assumes that the customer will read the word "available" in [] scattered [locations] spanning the [fifty-eight-page Terms and Conditions] and come to a conclusion – [ESL] will use the available balance

method when determining overdraft fees. But this assumes too much." *Id.* Further, just as it was the case in *LGE*, none of ESL's contracts "clearly articulate[] which balance calculation method [ESL] was using to determine when unsettled transactions would trigger an overdraft." 935 F.3d at 1240. Customers cannot be expected to bear the burden of knowing banking terms of art ESL never defines.

Though ESL ignores it, there is a well-developed body of case law evaluating overdraft fee claims and the arguments ESL makes here. For example, in *In re TD Bank, N.A.*, the district court upheld the plaintiffs' breach of contract claim, holding that the plaintiffs had stated a valid claim that the use of "available balance" to determine overdraft fees violated the governing contracts. 150 F. Supp. 3d 593, 622–25 (D.S.C. 2015). The plaintiffs alleged that those contracts, like the ones here, promised that TD Bank would use the actual or ledger balance to make overdraft determinations because they referred to "sufficient funds," "negative balance," and "money in the account." *Id.*

> After analyzing substantially similar contract language, *TD Bank* held:
>
> To the extent count I [for breach of contract] incorporates the sufficient funds theory of liability (i.e. the use of available balance to assess overdraft fees), *the plaintiffs state a plausible claim for relief and count I survives the motion to dismiss*. At the very least, there are outstanding factual questions on when TD Bank actually "advanced funds," whether imprecise use of the terms "negative balance" and "negative available balance" created a duty on the Bank's part to only assess overdraft fees when the "actual balance" was negative, and the like.

*Id.* at 624 (emphasis added).

Several courts have upheld other nearly identical breach of contract claims at the dismissal stage. For instance, in *Gunter*, the account agreement stated the defendant credit union could, at its discretion "honor withdrawal requests that overdraw [a customer's] account," and "charge fees for overdrafts . . . [and went] on to describe Courtesy Pay as 'a service that allows [UFCU] to pay an item presented for payment against your checking account even if it causes the account to become overdrawn.'" 2016 WL 3457009, at *3. The court held this language was ambiguous as to whether the credit union was bound to rely on the ledger balance.

Then, in *Wodja*, the account agreement stated:

> If on any day, the available funds in your checking account are not sufficient to cover checks and other items posted to your account, those checks and items will be handled in accordance with our overdraft procedures or an overdraft protection plan you have with us.

2016 WL 3218832, at *3. The court held that it "is not convinced that the language is as clear as WSECU asserts" and further held that "it cannot be contested that this is a classic breach of contract allegation"; and "there is solid ground to deny the motion to dismiss." *Id.* at *3–4.

*Pinkston-Poling* held that the plaintiff had stated a valid claim for breach of the account agreement based on "sufficient funds" language because "the pertinent language could be construed to mean that an overdraft fee will not be charged unless the presented item exceeds the actual/ledger balance, and not the available balance." 227 F. Supp. 3d at 854–55.

Likewise, in *Ramirez*, the district court considered an account agreement, including its funds availability policy, and held:

> Here, the Customer Agreements contain no provision specifying which method BCU uses to determine a customer's balance for assessing overdrafts. Both parties put forth reasonable, opposing interpretations of the agreement. Defendant reasonably asserts that the Deposit Account Agreement's repeated use of "available balance," plus other contractual hints that the "available balance" is some subset of a customer's ledger balance, demonstrates that BCU does not use a customer's ledger balance in assessing overdrafts. Plaintiff reasonably asserts that the agreement fails to define "available balance," or otherwise clearly indicate to a customer that her "available balance" is somehow different from her ledger balance. The Court cannot resolve this ambiguity on a motion to dismiss.

2017 WL 1064991, at *4–5. Similar findings are warranted here.

### B. ESL Is Barred from Charging More Than One Fee per Item

Ms. Roy's second contract claim challenges ESL's assessment of multiple $37 fees on the same (often small-dollar) electronic transactions or checks when reprocessed again and again after initially being returned for insufficient funds (for example, an astounding *$111 in RI Fees on a single $34.93 ACH payment*). The practice is egregious and punitive, and it is barred by the contract. ESL's Motion

should be denied for multiple reasons. First, the Account Documents, reasonably read, mean that for all payments other than through its Bill Pay Service, ESL will charge a single fee per item, even if it is reprocessed multiple times. Second, ESL's interpretation of the key contract term is not in harmony with the way other credit unions and banks use it. Third, ESL's interpretation is at odds with the way NACHA uses the key term. Finally, ESL's suggested reading is internally inconsistent.

### 1) Ms. Roy's Interpretation of the Account Documents is Reasonable.

ESL's Account Documents repeatedly urge accountholders to look to the Fee Schedule for details on RI Fee assessment. According to the Fee Schedule, ECF No. 30-1;

> Overdraft Fees
> Overdraft/Insufficient Funds………...$37.00
> Overdraft/Uncollected Funds ………$37.00
> POS Overdraft (Purchase Amount) $.01 - $5.00 …….Free
> >$5.01…………….$37.00

Standing alone, this Fee Schedule can reasonably mean either that ESL will charge one $37 RI Fee for an item that is reprocessed multiple times, or it could potentially mean a new RI Fee will be assessed each time. It plainly does not specify either way and thus it is at least ambiguous. But it is the Deposit Agreement that makes Ms. Roy's reading even more reasonable, and ESL's unreasonable: "[A]n Overdraft/ Insufficient Funds fee will be charged by ESL for each 'insufficient funds' item presented for payment and returned unpaid on a share draft account." This is a promise for one fee per "item," not for a fee *each time* an "item" is returned. Indeed, the term "item" has a well-worn, commonly understood industry meaning, as discussed below. An "item" is still the same "item" even if reprocessed multiple times.

The separate EFT Disclosure also supports Ms. Roy's position. That document expressly discloses the possibility of multiple RI Fees for certain types of electronic transactions *not at issue here* (*viz.*, when accountholders pay certain electronic bills through ESL's Online Bill Payment Service). Here's how ESL discloses the possibility of RI Fees for *those* types of payments:

> If the payment was electronic, the **ESL Online Bill Pay provider** will attempt to collect funds up to three times, and an insufficient funds fee will be collected for each attempt where the funds are not available in the account.

ECF No. 31-2 (emphasis added). Here, Ms. Roy *did not use the "ESL Online Bill Pay" service* on the items at issue. She made external transfers, which are covered by a different fee provision in the EFT Agreement:

> Transfers to External Accounts If you have requested an External Account Transfer, we will charge the account which you are transferring funds from according to the Fee Schedule for each transfer that you send. If you authorize an External Account Transfer that causes your designated ESL account to overdraft, your account will be charged an overdraft charge (see Fee Schedule for amount). However, ESL reserves the right to cancel any External Account Transfer that would cause your designated ESL account to be overdrawn.

*Id.*

Together, these provisions mean that multiple RI Fees on payments *not* covered by it (like Ms. Roy's external ACH transactions) are barred. ESL clearly knew how to disclose multiple RI Fees on the same "payment" when it wanted. Its failure to do so with respect to the ACH payments at issue here indicates that ESL did not intend to do so. In sum, when ESL's contract only says its own Bill Pay service can incur multiple RI Fees, its silence must be understood to be intentional as to all other transaction types. *See Eastman Kodak Co. v. Altek Corp.*, 936 F. Supp. 2d 342, 351 (S.D.N.Y. 2013). Conversely, if, as ESL argues, it is clear to reasonable consumers that "items" or "payments" become eligible for *new* RI Fees each time they are reprocessed, the warning to accountholders in the EFT Agreement for Bill Pay Service transactions would not be necessary.

Each of these disclosures mean "a" fee may be charged for each "item." These provisions, along with the common sense, industry usage, and contractual context discussed below, must mean an "item" cannot become a new "item" when ESL returns and reprocesses it one or more times. An "item," in short, cannot transmogrify into a new "item" when it is reprocessed. At best, the term "item" is ambiguous and on that basis the motion must be denied.

### 2) Banks Large and Small Use the Term "Item" in the Commonsense, Plain   Way that Plaintiff Urges

ESL's multiple fee practice is not universal. For example, JP Morgan Chase ("Chase") charges a maximum of one NSF Fee per item. Chase's disclosures state that an "item" maintains its integrity even if multiple processes are effected on it: "If we return the same item multiple times, we will only charge you one Returned Item Fee for that item within a 30-day period." Attached hereto as Ex. 1.[3] First Citizens Bank engages in the same abusive multiple fee practice as ESL, however (unlike ESL) it expressly provides in its deposit agreement that "[b]ecause we may charge a service fee for an NSF item *each time it is presented*, we may charge you more than one service fee for any given item."[4] (emphasis added). First Financial Bank also clarifies its practice and the meaning of "item," noting "[m]erchants or payees may present an item multiple times for payment if the initial or subsequent presentment is rejected due to insufficient funds or other reason (representment). Each presentment is considered an item and will be charged accordingly."[5] There are many other examples.[6] In short, there is a broad usage throughout the industry where "item" means what Ms. Roy says it means in the absence of contract language defining that key term otherwise. *Indeed, the sample disclosures reproduced above would be nonsensical if the undefined term "item" had the contorted meaning that ESL now tries to impute to it: that an "item"*

---

[3] Because the Complaint references common usage of the terms and practices elsewhere in the banking industry, the Court may consider these documents. In the alternative, Ms. Roy would seek leave to amend her Complaint to plead them expressly.

[4] https://www.firstcitizens.com/personal/banking/deposit-agreement (last accessed Sept. 20, 2019).

[5] https://www.bankatfirst.com/content/dam/first-financial-bank/FFB_Terms_and_Conditions.pdf (last accessed September 20, 2019).

[6] Central Pacific Bank states in its Fee Schedule under the "MULTIPLE NSF FEES" subsection: "Items and transactions (such as, for example, checks and electronic transactions/payments) returned unpaid due to insufficient/non-sufficient ("NSF") funds in your account, may be resubmitted one or more times for payment, and a $32 fee will be imposed on you each time an item and transaction resubmitted for payment is returned due to insufficient/nonsufficient funds." Attached hereto as Ex. 2. BP Credit Union likewise states: "Your account may be subject to a fee for each item regardless of whether we pay or return the item. We may charge a fee each time an item is submitted or resubmitted for payment; therefore, you may be assessed more than one fee as a result of a returned item and resubmission(s) of the returned item." Attached hereto as Ex. 3.

*becomes a new "item" each time it is reprocessed.* It is ESL, not Ms. Roy, that offers an unusual, unanticipated definition of the common term "item," one the Court should determine is unreasonable.

### 3) NACHA Uses a Similar Term to "Item" But Applies Like Ms. Roy Does

ESL relies on the rules and guidance of the NACHA system. Mot. At 12. The Deposit Agreement incorporates the NACHA Rules and guidance. But under those rules, and as a matter of *fact*, the items at issue here are the same item when they are reprocessed multiple times. The NACHA Rules support Ms. Roy's interpretation: an "item" is not a new "item" when it is reprocessed.

Using an analogous term ("Entry"), the NACHA Rules are clear that the same "Entry" may undergo multiple processing attempts, but nevertheless remains the *same* "Entry." And contrary to ESL's argument that about the purported "practical realities of modern day banking," and that ESL does not "does not physically examine each transaction," ECF No. 21 at 9, 11, NACHA has specific requirements alerting ESL to the reality that the same Entry is being reprocessed a second or third time. Indeed, in September 2015, NACHA began requiring all merchants to expressly code as "RETRY PAYMENTS" any Entry that had previously been submitted and returned for insufficient funds (*not* coding them as a *new* "Entry"). *See* 2019 NACHA Operating Rules, Subsection 2.12.4.2 Formatting Requirements for Reinitiated Entries.[7] Ms. Roy alleges ESL bank statements expressly identify subsequent processing attempts as "RETRY PAYMENTS." *Id.* at 35, 37. ESL knew, in short, that these processing attempts were not for new Entries or items.

NACHA Rules make clear than an "Entry" is the same "Entry" when even when reprocessed

---

[7] "An Originator or ODFI must submit Reinitiated Entries as a separate batch that contains the word 'RETRY PYMT' in the Company Entry Description field of the Company/Batch Header Record. For any Reinitiated Entry, the description 'RETRY PYMT' must replace the original content of the Company Entry Description field transmitted in the original Entry, including content otherwise required by these Rules. The contents of the Company Name, Company Identification, and Amount fields of the Reinitiated Entry must be identical to the contents of the original Entry. The contents of other fields should be modified only as necessary to correct an error or facilitate proper processing of the Reinitiated Entry."

*unless* the merchant receives a *new authorization from the consumer* for the payment amount:

> [A] debit Entry will not be treated as a reinitiated Entry if:
> - the debit Entry is one in a series of preauthorized, recurring debit Entries and is not contingent upon whether an earlier debit Entry in the recurring series has been Returned; or,
> - the Originator obtains a new authorization for the debit Entry after it receives the original Return Entry.

*See* 2019 NACHA Operating Rules, Subsection 2.12.4.2 Formatting Requirements for Reinitiated Entries. The NACHA Rules, in other words, make clear that such authorizations can only come from accountholders, not from merchants, and indeed it is fraudulent for merchants to code transactions otherwise. This directly rebuts ESL's argument that the merchant initiated a new, separate "item" or a new order for payment. An "Entry" and an "item" are analogous. Read in conjunction with the NACHA Rules, ESL's contract cannot–and does not—authorize fees barred in analogous circumstances by the same NACHA rules on which it purports to incorporate.

> **4) Contractual Context and ESL's Own Bank Statements Indicate the Same Item Cannot Incur More Than One NSF or OD Fee**

Context in both the Account Documents and transaction descriptions on ESL's account statements support Ms. Roy's interpretation of "item." As the statements furnished to Ms. Roy indicate, ESL understood her payments to be single items because, pursuant to the NACHA Rules, ESL described subsequent attempts of the same item as a "RETRY PAYMENT"—*i.e.*, mere iterations of the same initial item, not a new item *ex nihilo*.

Contractual context also matters. As quoted above, the Fee Schedule collapses charges for when a payment is *made* on an insufficient account balance and when a payment is *rejected* into a single term: "Overdraft Fees." ECF No. 30-2. Other Deposit Agreement provisions use the terms "overdraft" and "insufficient funds" interchangeably, for example: "An Overdraft/Insufficient Funds fee will be charged to your share draft account, in accordance with our Fee Schedule, for each overdraft Item that is cleared on your share draft account. In addition, an Overdraft/Insufficient

Funds fee will be charged by ESL for each 'insufficient funds' item presented for payment and returned unpaid on a share draft account." *Id.* In short, ESL uses identical language for both types of fees, *even though an overdraft item can never be reprocessed*. Indeed, it is always impossible for an overdraft item to incur more than one overdraft fee; once such an item is paid into overdraft, it cannot be eligible for another fee or become a new "item" for fee assessment purposes. ESL argues that returned items *can* undergo this alchemy, but because RI Fees are disclosed by ESL in the identical manner as OD Fees, these contract provisions reasonably mean that items can incur at most a single OD Fee or a single RI Fee. Customers are not warned that a returned item or its associated fee is fundamentally different from an overdraft item in this important way.

### 5) The Account Documents State that ESL May Charge an RI Fee on Each Item, Not Each Time an Item is Processed

An "item" is the same "item" even if ESL processes it for payment more than once. And ESL promised to assess a single RI Fee per "item." *See supra.* Because ESL assesses *multiple* RI Fees on the same "item" in violation of Account Documents, Ms. Roy has pled a valid breach of contract claim.

ESL argues that "[e]ven assuming Plaintiff is correct that an item is the 'same' item no matter how many different ACH transactions are initiated for a payment (which she is not), the Membership Agreement nowhere states that only one fee may be charged 'per item' no matter how many times a third-party merchant submits presents a transaction for payment." Mot., 11. ESL relies on the Deposit Agreement provision that "an Overdraft/Insufficient Funds fee will be charged by ESL for each 'insufficient funds' item presented for payment and returned unpaid on a share draft account." As discussed above, this provision states precisely what ESL says it doesn't: that an NSF Fee can be charged on each "*item*," not "each *time* an item is processed" (through no action of the customer). "Each" refers to the item, not to any action undertaken on such item (reprocessing it). At the very least, again, Ms. Roy's reading is a reasonable one.

ESL also argues, without support, that "Plaintiff's suggestion that fees are assessed on the

"same" transaction is erroneous: *each time a merchant submits an item for payment, it is a new transaction.*" Mot., at 12. (emphasis added). But that contradicts  the NACHA Rules (as discussed above) and the plain terms of the contract. A merchant cannot, on its own, create a new payment or transaction. Only an accountholder can do that, and Ms. Roy only did that once. Crucially, the EFT Disclosure states: "The ESL ACH transaction service allows you to electronically perform credits and debits against your share accounts at ESL and transfer funds from other financial institutions to pay your loans or mortgages at ESL. These transactions are authorized by you through ESL or another institution and transmitted electronically." ECF No. 31-2. This means an item is created by the action of an accountholder, not by a merchant.

ESL also argues that it must process entries in the NACHA system, and that it has the right to return entries for insufficient funds. But Ms. Roy does not challenge either. The question is solely what ESL's Account Documents disclose about its fee practices, which it (not NACHA) exclusively disclose and control. The Account Documents allow fees to be assessed not each *time* an item is returned, but for each *item* returned. Because Ms. Roy has, at the very least, put forth a reasonable interpretation of the meaning of "item," that phrase is at the very least, ambiguous. Any ambiguity must be construed against ESL, as the drafter of the operative contract, and should not be resolved in ESL's favor on a motion to dismiss.

In the directly analogous *Morris* case, plaintiffs lodged identical claims regarding the assessment of multiple NSF Fees on the same item against Bank of America. Relying on numerous other bank fee cases, the court denied the motion to dismiss:

> Plaintiffs base their breach of contract claim on both express breach and breach of the implied covenant of good faith and fair dealing. *See, e.g, In re HSBC Credit Union*, 1 F. Supp. 3d 34, 54 (E.D.N.Y. 2014) (allowing claim to proceed despite HSBC's argument that it had contractual authority to post debit transactions from high to low); *Gutierrez v. Wells Fargo*, 622 F. Supp. 2d 946, 954 (N.D. Cal. 2009) (allowing claim to proceed despite Wells Fargo's argument that it had contractual authority to post items to checking account in any order the bank chose); *White v. Wachovia Credit Union, N.A.*, 563 F. Supp. 2d 1298, 1363 (N.D. Ga. 2008) (declining to dismiss plaintiff's breach of

the implied covenant of good faith and fair dealing at the motion to dismiss stage when plaintiff alleged that Wachovia "breached the contract provisions [of its Deposit Agreement] de facto even if it maintained performance de jure" in manipulating transactions to maximize overdraft fees); *Hunting Aircraft, Inc. v. Peachtree City Airport Auth.*, 281 Ga. App. 450, 453–54 (2006) ("[W]here the manner of performance is left more or less to the discretion of one of the parties to the contract, he is bound to the exercise of good faith.")…Applying these precedents to the facts alleged here, Plaintiff have sufficiently alleged a breach of contract claim under both theories.

*Morris v. Bank of Am., N.A.*, No. 3:18-CV-157-RJC-DSC, 2019 WL 1274928, at *2  (W.D.N.C. Jan. 8, 2019) (additional citation omitted).[8]

Further, three more recent rulings in cases challenging multiple NSF Fees on the same "item" all denied  motions to dismiss.[9] This Court should adopt *Morris*, *Tisdale*, *Garcia*, and *Tannehill*'s reasoning and deny the Motion. Ambiguities in descriptions of banks' and credit unions' fee assessment methods contained in account contracts support consumer claims for recovery of excessive fees, at least at the motion to dismiss stage. *See also Pinkston-Poling*, 227 F. Supp. 3d at 854-855; *Gunter*, 2016 WL 3457009, at *2-3; *Wodja*, 2016 WL 3218832, at *2-3.

Ignoring a multitude of cases to the contrary, ESL relies heavily on a recent non-binding district court order in *Lambert v. Navy Federal Credit Union,* No. 19-cv-103-LO, 2019 WL 3843064 (E.D. Va. Aug. 14, 2019), which is pending appeal. That reliance is misplaced, and *Morris* offers the correct analogy. Navy Federal's contract differs. In making its holding, the court in *Lambert* relied heavily on a distinction between paper check transactions and ACH transactions flowing from Navy Federal's

---

[8] *See also Lloyd v. Navy Fed. Credit Union*, No. 17-cv-1280-BAS, 2018 WL 1757609, at *7 (S.D. Cal. April 12, 2018) (denying motion to dismiss because plaintiffs offered reasonable interpretation in face of contractual ambiguities).

[9] *See Tannehill v. Simmons Bank*, No. 3:19-cv-140-DPM (E.D. Ark. Oct. 21, 2019) (ECF No. 23), attached as Ex. 4 (permitting claims for breach of contract, breach of the implied covenant of good faith and fair dealing, and unjust enrichment, noting and "the rather complicated ACH rules," meant "the Court [was] unable….to hold unequivocally at the threshold that [Plaintiff's] breach claim fails as a matter of law"); *Tisdale v. Wilson Bank and Trust*, No. 19-400-BC (Davidson Co. Tenn. Chancery Court Oct. 17, 2019), attached as Ex. 5 (finding contract was ambiguous due to failure to define key contract terms, and that plaintiff offered reasonable contract interpretation); *Garcia v. UMB Bank NA*, No. 1916-CV01874 (Jackson Co. Mo. Circuit Court Oct. 18, 2019), attached as Ex. 6 (same).

contract's specific wording (that ESL does not use). Unlike here, the contract in *Lambert* contained a definition of "item" that included "ACH debits." *Id.* at *6-7. By contrast, here there is no definition of "item" and the definition of "debit" is not at issue. *Lambert* also overlooked that the term "item" has a common, well-understood meaning amongst consumers and other banks and credit unions, as discussed herein. Finally, *Lambert* was not required to follow *Roberts*, and failed to distinguish *Morris*.

## II. Ms. Roy Has Sufficiently Plead a Violation of the Covenant of Good Faith and Fair Dealing

ESL violates the covenant of good faith and fair dealing by unfairly exploiting contractual discretion, contrary to the reasonable expectations of accountholders. "In New York, all contracts contain an implied covenant of good faith and fair dealing, under which 'neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.'" *Claridge v. N. Am. Power & Gas, LLC*, No. 15-CV-1261 PKC, 2015 WL 5155934, at *6 (S.D.N.Y. Sept. 2, 2015) (quoting *511 W. 232nd Owners Corp. v. Jennifer Realty Co.*, 98 N.Y.2d 144, 153 (2002)). "Where the contract contemplates the exercise of discretion, this pledge includes a promise not to act arbitrarily or irrationally in exercising that discretion." *Id.* (quoting *Dalton v. Educ. Testing Serv.*, 87 N.Y.2d 384, 389 (1995)). "[C]ourts employ the good faith performance doctrine to effectuate the intentions of the parties, or to protect their reasonable expectations." *M/A-COM Sec. Corp. v. Galesi*, 904 F.2d 134, 136 (2d Cir. 1990).

ESL violates the implied covenant in several ways. First, ESI often charges more than one RI Fee on the same item, even though the contract states—and reasonable consumers understand—that the same transaction can only incur a single RI Fee. ECF No. 30 at ¶ 3. The root of this issue is ESL's warped interpretation of the term "item" as referring to each attempt to pay an instruction for payment, even where there are multiple attempts to fulfill the same instruction for payment, and when no action is taken by the customer to resubmit. *Id.* at ¶¶ 45–55. ESL's interpretation results in

egregious amounts of fees being charged to customers which they could not have predicted. In Ms. Roy's case ESL charged $111 in RI Fees to attempt to process a single $34.93 payment. *Id.* at ¶ 38.

Second, ESL assesses overdraft fees not on actual amount of money in an account, as any reasonable customer would expect, but rather on a fictional account balance unilaterally manufactured by ESL. Instead of utilizing the balance it provides to customers on their monthly statements and in other places, ESL creates a fictional balance. *Id.* at ¶¶ 60–65. In the absence of an express disclosure otherwise, no reasonable customer would understand the word "balance" to be applied in the manner that ESL applies it. *Id.* at ¶ 65. ESL has charged Ms. Roy OD Fees in this manner. *Id.* at ¶¶ 66–67.

ESL incorrectly characterizes Ms. Roy's implied covenant claim as one that conflicts with the express terms of the contract and merely duplicative of her contract claims. Mot. at 17–18. First, as discussed in Section 1.2, *supra*, no express contractual provisions authorize ESL to levy RI Fees or OD Fees as it does. Second, her implied covenant claim differs from her express breach claims by focusing on the abuse of contractual discretion, and on ESL's leaving key terms undefined and interpreting them in an unreasonable manner. ECF No. 30 at ¶¶ 45–74. The claim is brought only concerning those issues which are "not explicitly bar[red]" by the contract. *Id.* at ¶ 68. The claims are brought in the alternative, and assume a finding that no explicit breach has occurred by the Court.

The cases ESL cites are inapposite. *See, e.g., Hall v. Earthlink Network, Inc.*, No. 98 CIV. 5489 (RO), 2003 WL 22990064, at *2 (S.D.N.Y. Dec. 19, 2003) (dismissing breach of contract and implied covenant of good faith claims as "entirely too speculative" because they were based on an unestablished claim of business interruption). The implied covenant claim in *Int'l Techs. Mktg., Inc. v. Verint Sys., Ltd.* rested not on an entirely distinct allegation of abuse of contractually-granted discretion, but rather on "the same allegations" at issue in a breach of contract claim that involved the defendant's "delay or motivation for its delay" in carrying out the contract. 157 F. Supp. 3d 352, 369 (S.D.N.Y. 2016). The implied covenant claim in *Symquest Grp., Inc. v. Canon U.S.A., Inc.* was dismissed because

"the same allegations underlie both . . . breach of contract claim and its claim for breach of the implied covenant of good faith and fair dealing—i.e., that Canon failed to provide SymQuest with post-termination support services" which is was explicitly allowed to do under the contract. 186 F. Supp. 3d 257, 266 (E.D.N.Y. 2016). Finally, *Canstar v. J.A. Jones Const. Co.* offers only a rote recitation that the implied covenant claim "is intrinsically tied to the damages allegedly resulting from a breach of the contract" but no more information with which to reason why. 622 N.Y.S.2d 730 (1995). None of these cases are similar to the case here, where the damages are precisely quantifiable, and the implied covenant claim rests on not only an unreasonable interpretation of the contract terms, but also, crucially, an inappropriate exercise of discretion. Ms. Roy's implied covenant claim is no mere cut-and-paste of her contract claim, and dismissal on that basis would be improper.

## III.   Ms. Roy States a Claim for Violation of GBL §349

ESL argues that Ms. Roy's GBL §349 claims should be dismissed because: (1) ESL's practices complied with its Account Documents; and (2) Ms. Roy has asserted no independent loss.

ESL's first argument echoes its breach of contract argument, and fails in the same way. Its reading of the contract is just as wrong with respect to whether the language is deceptive and whether its unfair fee practices are allowed under the contract.[10]

Moreover, whether or not the documents are materially misleading is a factual matter, appropriately left at this stage for the finder of fact.[11] Ms. Roy has adequately alleged that ESL engaged

---

[10] *See e.g. In re Checking Account Overdraft Litig.*, 694 F.Supp.2d 1302, 1325 (S.D. Fla. 2010) (applying New York law, "Plaintiffs are alleging that the actions of Defendant banks, in manipulating and reordering Plaintiffs' debit transactions, are deceptive and do not comply with the terms of the contract. Plaintiffs therefore sufficiently allege a "deceptive practice."); *Goldman v. Simon Property Group, Inc.*, 869 N.Y.S.2d 125, 129-30 (2d Dep't 2008) (allegation that fee was deceptive and not conspicuously disclosed sufficient to state a cause of action under GBL § 349); *Negrin v. Norwest Mortg., Inc.*, 700 N.Y.S.2d 184 (2d Dep't 1999) (allegations of a bank's unilateral imposition of fees upon its customers state a valid GBL § 349 claim).
[11] *Segovia v. Vitamin Shoppe, Inc.*, 14-CV-7061-NSR, 2017 WL 6398747, at *7 (S.D.N.Y. Dec. 12, 2017); *People ex rel. Schneiderman v. Orbital Publ'g Grp.,* 21 N.Y.S.3d 573, 586 (N.Y. Sup. Ct. 2015).

in deceptive business acts and practices under the GBL by making false promises regarding its fee practices. Similar allegations have long been upheld in analogous cases where contract language is misleading. *See, e.g., Chiste v. Hotels.com L.P.*, 756 F. Supp. 2d 382, 406 (S.D.N.Y. 2010) (allegations sufficient because the "peculiar (and syntactically difficult) wording of [agreement]" made it so "a consumer would not necessarily expect that Hotels.com [would] collect more in taxes than it is actually required to collect by law[.]")

Second, ESL essentially argues that the GBL claim is duplicative of the breach of contract claim, and lacks the "monetary loss requirement." However, Ms. Roy may properly bring a § 349 claim and a breach of contract claim simultaneously. *See* Fed. R. Civ. P. 8(a); *Gold v. 29-15 Queens Plaza Realty, LLC*, 841 N.Y.S.2d 668, 669 (App. Div. 2007) (citing cases). In arguing to the contrary, ESL reads *Spagnola v. Chubb*, 574 F.3d 64, 66-73 (2d Cir. 2009), too broadly. As the Second Circuit has since recognized, both a breach of contract claim and § 349 claim may coexist. The Second Circuit made clear that no such broad requirement exists under New York Law. *Nick's Garage, Inc. v. Progressive Cas. Ins. Co.*, 875 F.3d 107 (2d Cir. 2017). *Nick's Garage* involved breach of contract and GBL claims that both involved an insurer's failure to reimburse labor costs in accordance with competitive rates. *Id.* at 125. The Second Circuit stated that while defendant "argues that the § 349 claims [] fail because they do not allege an injury independent of their contract damages [] [t]he cases on which [defendant] relies, however, do not establish such a requirement." *Id.*[12] Regardless, Ms. Roy can plead alternative theories.

## IV.    Ms. Roy's Claims Are Not Preempted

ESL incorrectly asserts that Ms. Roy's claims are preempted because ESL is a federal credit union. Mot. at 19–20. To do so, ESL mischaracterizes her claims. The question posed is whether ESL

---

[12] *See also Donnenfeld v. Petro, Inc.*, 333 F. Supp. 3d 208, 224 (E.D.N.Y. 2018) (applying *Nick's Garage*, not *Spagnola*, and declining to dismiss a § 349 claim stating that New York law does not require that a GBL injury be independent of alleged breach of contract damages); *Carias ex rel. Matos v. Monsanto Co.*, No. 15-CV-3677-JMA, 2016 WL 6803780 (E.D.N.Y. Sept. 30, 2016) (finding unpersuasive argument that loss under GBL § 349 must be independent of the loss caused by the alleged breach of contract).

breached the contract or misrepresented its fee practices. Such claims are not preempted because credit unions, like banks, must follow the same general laws as other businesses.

With respect to Ms. Roy's GBL § 349 claim, plainly misreading her pleading, ESL wants the Court to believe that her claims are actually failure to disclose claims by picking some phrases out of the complaint that plead failures to disclose. *Id.* When reviewing similar consumer protection claims, even *Lambert* made the uncontroversial finding that similar claims were based in misrepresentations, not failures to disclose, when rejecting preemption. *Lambert*, 2019 U.S. Dist. LEXIS 138592, at *7. Here too, the instant Amended Complaint is clear that affirmative misrepresentations in the form of false promises by ESL, not just omissions, are the basis for the claim (though to be sure, ESL is correct that it deceptively omitted material facts as well). The Amended Complaint explicitly alleged that ESL violates its express promises to its customers:

> Contrary to these promises, ESL's uniform policy and practice is to disregard the actual amount of money in the account or whether there is a negative balance and, instead, to assess OD Fees based on a manufactured balance that deducts holds placed on pending debit card transactions or deposits.

ECF No. 30 ¶ 63. The Amended Complaint details what exactly these misrepresentations entail, and how ESL misrepresents its true practices: "The [Account Agreement] contains a *promise* that ESL will not charge OD Fees for transactions when there is sufficient money in the account to pay for the transaction . ." *Id.* at ¶ 7 (emphasis added). The allegation is not that ESL fails to inform, rather that it *promises* it will not charge OD Fees for transactions with sufficient money in the account to cover. As Ms. Roy further alleges, "[t]he Account Agreement also promises that OD Fees will be charged only "for each overdraft item" with "overdraft" having previously been defined as a negative account balance [.]" *Id.* at ¶ 8 (emphasis added). Thus, ESL ignores what Ms. Roy actually pleads.

Further, it is well-settled that federal banking laws do not preempt state consumer protection statutes of general application, such as GBL § 349, or contract or quasi-contractual law. States have always enforced their general laws against national banks and credit unions as long as the state laws

do not interfere with the banking business or with federal regulators' ability to enforce federal banking laws. *See Cuomo v. Clearing House Ass'n, L.L.C.*, 557 U.S. 519, 532-33 (2009). In *Watters v. Wachovia Bank, N.A.,* the Supreme Court held that "federally chartered banks are subject to state laws of general application in their daily business to the extent such laws do not conflict with the letter or general purposes of the NBA." 550 U.S. 1, 11 (2007).[13]

Banks and credit unions must uphold their contractual obligations, and are subject to laws barring misrepresentation, fraud, and unconscionability—just like any other business. *See Martinez v. Wells Fargo Home Mortg., Inc.*, 598 F.3d 549, 555 (9th Cir. 2010). No regulations exempt federal banks and credit unions from generally applicable state laws that incidentally affect the imposition of such fees. As the Ninth Circuit recognized, such "an expansive interpretation—with no limiting principle—'would swallow all laws.'" *Gutierrez v. Wells Fargo Bank*, 704 F.3d 712, 727 (9th Cir. 2012) (quoting *Aguayo v. U.S. Bank*, 653 F.3d 912, 925 (9th Cir. 2011)).[14]

Further, ESL bears the burden of establishing preemption. *See e.g.*, *Stewart v. Riviana Foods Inc.*, No. 16-cv-6157-NSR, 2017 WL 4045952, at *4 (S.D.N.Y. Sept. 11, 2017) (citing *Bruesewitz v. Wyeth LLC*, 562 U.S. 223, 251 n.2 (2011)). ESL has not carried this burden, as it fails to cite a *single law or regulation* which preempts Ms. Roy's claims, nor *any basis for how* the claims would impermissibly interfere with ESL's powers as a national credit union.

---

[13] *See also In re HSBC Bank, USA, N.A.*, 1 F. Supp. 3d 34, 46-48 (E.D.N.Y. 2014) (collecting cases and stating "federal courts addressing this type of alleged misconduct have declined to hold that state claims, based on both statutory and common law, are preempted by the NBA or OCC regulations."); *Zink v. First Niagara Bank, N.A.*, 18 F. Supp. 3d 363, 369 (W.D.N.Y. 2014); *Miller v. Wells Fargo Bank, N.A.*, 994 F. Supp. 2d 542, 552 (S.D.N.Y. 2014); *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, No. 11-md-2262-NRB, 2015 WL 6696407, at *25 (S.D.N.Y. Nov. 3, 2015); *Baldanzi v. WFC Holdings Corp.*, No. 07-cv-9551-LTS, 2008 WL 4924987, at *2 (S.D.N.Y. Nov. 14, 2008); *Binetti v. Wash. Mut. Bank*, 446 F. Supp. 2d 217, 218 (S.D.N.Y. 2006); *Walker v. People's United Bank*, 305 F. Supp. 3d 365, 377-78 (D. Conn. 2018).

[14] *See also Decohen v. Capital One, N.A.*, 703 F.3d 216, 222 (4th Cir. 2012) ("Despite the broad scope of the NBA . . . national banks 'are subject to state laws of general application in their daily business to the extent such laws do not conflict with the letter or the general purposes of the NBA.'" (quoting *Watters*, 550 U.S. at 11)).

**A. Ms. Roy's Breach of Contract Claim is Not Preempted**

Courts have repeatedly held that breach of contract claims are not preempted. This makes sense: national financial institutions are not free "to ignore general contract or tort law," requiring them to abide by their customer contracts could at most incidentally impact their ability to conduct business. *In re HSBC*, 1 F. Supp. 3d at 46 (quoting *In re Checking Acct. Overdraft Litig.*, 694 F. Supp. 2d 1302, 1313 (S.D. Fla. 2010)). Thus, claims seeking to "recover for past conduct that was inconsistent with [the defendant's] contractual obligations" only "incidentally affect" a financial institution's federal powers and do not "prevent or significantly interfere with its ability to engage in the business of banking." *King v. Carolina First Bank*, 26 F. Supp. 3d 510, 515, 517 (D.S.C. 2014); *see also In re TD Bank, N.A.*, 150 F. Supp. 3d 593, 610 (D.S.C. 2015) (breach of contract claims not preempted); *Old Nat. Bank v. Kelly*, 31 N.E.3d 522, 528-31 (Ind. Ct. App. 2015) (same).

Ms. Roy does not challenge ESL's general right to assess OD Fees or RI Fees under the applicable federal regulations; rather, she seeks to hold ESL to the plain contractual language it imposed, which confers only the right to charge OD Fees on transactions that actually overdraw the account and to charge RI Fees only once on the same "item." *See, e.g.*, *Hanjy v. Arvest Bank*, 94 F. Supp. 3d 1012, 1025 (E.D. Ark. 2015). Adopting ESL's argument would render meaningless account contracts with federal financial institutions, permitting them to ignore their own promises.

**B. Ms. Roy's GBL § 349 Claim is Not Preempted**

Consistent with the cases holding that national financial institutions are subject to state laws of general application, numerous courts have held that consumer protection claims based on affirmative misrepresentations do no more than incidentally impact the defendant's banking activities and are not preempted.[15] Federal financial institutions have no right to make misrepresentations or

---

[15] *See, e.g.*, *Gutierrez*, 704 F.3d at 726-28; *Smallwood v. Sovereign Bank, F.S.B.*, No. 11-cv-87, 2012 WL 243744 (N.D. W.Va. Jan. 25, 2012); *In re HSBC*, 1 F. Supp. 3d at 48; *New Mexico v. Capital One Bank (USA) N.A.*, 980 F.Supp.2d 1314, 1333 (D.N.M. 2013).

break its promises to its customers. Rather:

> The New York contract, tort and consumer protection laws . . . do not prohibit any behavior required by the NBA or the OCC regulations. Nor do such state laws require national banks to do anything prohibited by federal law. National banks can thus simultaneously comply with the state and federal laws at issue.

*In re HSBC*, 1 F. Supp. 3d at 45 (citation omitted). *See also* OCC Advisory Letter, GUIDANCE ON UNFAIR OR DECEPTIVE ACTS OR PRACTICES, 2002 WL 521380, at *2, *7 n. 2 (Mar. 22, 2002) (warning national banks that "state laws [which] prohibit unfair or deceptive acts or practices…may be applicable to insured depository institutions.") ESL identifies no conflict as this case is about ESL's failure to conform its practices to the affirmative promises and contracts. As multiple courts have recognized, claims deriving from financial institutions' failure to conform its practices to its contractual promises, or from financial institutions' misrepresentations, are not preempted.

 *Whittington v. Mogiloil Federal Credit Union*, No. 16-cv-482, 2017 WL 6988193 (E.D. Tex. Sept. 14, 2017), cited by ESL, does not alter this conclusion. There, the plaintiff asserted claims that: (1) that the credit union "failed to disclose 'material facts'"; and (2) that its policies and practices were unconscionable. *Id.* at *1. The court found preemption to the extent the claims were not based on affirmative misrepresentations, but made clear that "direct misrepresentation" claims are not preempted. *Id.* at *11. Here, Ms. Roy's § 349 claims derive from ESL's direct misrepresentations *See supra* (quoting a portion of the alleged affirmative misrepresentations). Thus, *Whittington* supports Ms. Roy's § 349 claims. Likewise, in *Lambert*, the court found that only those claims that were not based on affirmative misrepresentations or breaches of contract were preempted. *Lambert*, 2019 WL 3843064, at *2. Furthermore, *Whittington* and *Lambert* are far narrower than other holdings in this Circuit on similar preemption issues. *See supra*.

## CONCLUSION

 For the above stated reasons, Ms. Roy respectfully requests that ESL's Motion is denied in its entirety.

Dated: December 9, 2019

Respectfully submitted,

*/s/ Jonathan M. Streisfeld*
**KOPELOWITZ OSTROW FERGUSON**
**WEISELBERG GILBERT**
Jonathan M. Streisfeld
One W. Las Olas Blvd., Suite 500
Fort Lauderdale, Florida 33301
Telephone: 954-525-4100
*streisfeld@kolawyers.com*

David M. Kaplan
**DAVID M. KAPLAN, Attorney at Law**
401 Penbrooke Dr., Bldg. 2, Ste. B
Penfield, New York 14526
Phone: (585) 330-2222
Facsimile: (585) 445-6767
*dmkaplan@rochester.rr.com*

Michael R. Reese
George V. Granade
**REESE LLP**
100 West 93rd Street, 16th Floor
New York, New York 10025
Telephone:      (212) 643-0500
Facsimile:      (212) 253-4272
*mreese@reesellp.com*
*ggranade@reesellp.com*

**KALIEL PLLC**
Jeffrey D. Kaliel (*pro hac vice* to be filed)
Sophia G. Gold (admitted *pro hac vice*)
1875 Connecticut Ave. NW 10th Floor
Washington, D.C. 20009
Telephone: (202) 350-4783
*jkaliel@kalielpllc.com*
*sgold@kalielpllc.com*

**TYCKO & ZAVAREEI LLP**
Andrea Gold
1828 L St NW, Suite 1000
Washington, DC 20036
Telephone: 202-973-0900
*agold@tzlegal.com*

*Counsel for Plaintiff and the Proposed Classes*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the 9th day of December, 2019, the foregoing was filed electronically on the CM/ECF system, which caused all CM/ECF participants to be served by electronic means.

Respectfully submitted,

*/s/ Jonathan M. Streisfeld*
Jonathan M. Streisfeld