UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

SUSAN ROY, on behalf of herself and
all others similarly situated,

Plaintiff,       Case # 19-CV-6122-FPG

DECISION AND ORDER

v.

ESL Federal Credit Union,

Defendants.

## INTRODUCTION

Plaintiff Susan Roy brings this putative class action against Defendant ESL Federal Credit Union for breach of contract, breach of the covenant of good faith and fair dealing, and violations of New York General Business Law ("GBL") Section 349(a). ECF No. 30. Plaintiff is a share draft (checking) account holder at ESL who alleges that two of ESL's fee-charging practices breach the Account Agreement[1] between ESL and its customers. The first is ESL's practice of charging overdraft or insufficient funds ("OD/NSF") fees on Automated Clearing House ("ACH") transactions even though a customer's account balance is sufficient to cover the transactions. The second is ESL's practice of charging multiple OD/NSF fees per "insufficient funds item" on ACH transactions. ESL responds that the Account Agreement expressly authorizes these practices and therefore ESL did not breach it. Because the Court finds that the Account Agreement is ambiguous as to whether it allows these practices, ESL's motion to dismiss Plaintiff's breach of contract and GBL claim is DENIED. However, the motion is GRANTED as to Plaintiff's covenant of good faith and fair dealing claim.

---

[1] Various separate documents govern the relationship between ESL and its customers. The first is the Savings and Checking Disclosure Terms and Account Agreement (the "Disclosure Agreement"). ECF No. 30-2. The second is the Electronic Funds Transfer Disclosure Statement and Agreement (the "EFT Agreement"). ECF No. 31-2. The third is the Fee Schedule. ECF No. 30-1. The Court collectively refers to these documents as the "Account Agreement."

**LEGAL STANDARD**

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint must state a plausible claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007)). In considering the plausibility of a claim, the Court must accept factual allegations as true and draw all reasonable inferences in the plaintiff's favor. *Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011). At the same time, the Court is not required to accord "[l]egal conclusions, deductions, or opinions couched as factual allegations . . . a presumption of truthfulness." *In re NYSE Specialists Sec. Litig.*, 503 F.3d 89, 95 (2d Cir. 2007) (quotation marks omitted). Along with the facts alleged in the complaint itself, a court may consider any documents attached to, incorporated by reference in, or integral to the complaint. *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010).

**DISCUSSION**

**I.     Breach of Contract Claims**

"On a motion to dismiss, the Court may dismiss a breach of contract claim for failure to state a claim if the 'plain language' of the contract contradicts or fails to support the plaintiff's allegations of breach." *Perks v. TD Bank, N.A.*, 444 F. Supp. 3d 635, 639 (S.D.N.Y. 2020) (citing *Orchard Hill Master Fund Ltd. v. SBA Commc'ns Corp.*, 830 F.3d 152, 156 (2d Cir. 2016)). The "court may dismiss a breach of contract claim only if the terms of the contract are unambiguous." *Orchard Hill*, 830 F. 3d at 156. "Whether or not a writing is ambiguous is a question of law to be resolved by the courts." *Orlander v. Staples, Inc*., 802 F.3d 289, 294 (2d Cir. 2015) (internal quotation marks and citations omitted). A contract is ambiguous under New York law "if its terms could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the

customs, practices, usages and terminology as generally understood in the particular trade or business." *Chesapeake Energy Corp. v. Bank of N.Y. Mellon Tr. Co., N.A*., 773 F.3d 110, 114 (2d Cir. 2014) (internal quotation marks and citation omitted).  Conversely, a contract is not ambiguous if its "language has a definite and precise meaning, unattended by danger of misconception . . . , and concerning which there is no reasonable basis for a difference of opinion." *Id*. (internal quotation marks and citation omitted).

A.    **ESL's Practice of Charging OD/NSF Fees Using the Available Balance Method Rather than the Actual/Ledger Balance Method**

Plaintiff first claims that ESL breaches the Account Agreement by charging OD/NSF fees on ACH transactions even though a customer's account balance is sufficient to cover the transactions. Underlying this claim is the parties' dispute over how the Account Agreement requires ESL to calculate a customer's account balance for the purpose of charging OD/NSF fees: does it require ESL to use the "actual" or "ledger" balance method, or the "available" balance method?

"The ledger [or actual] balance method considers only settled transactions," whereas "the available balance method considers both settled transactions and authorized but not yet settled transactions, as well as deposits placed on hold that have not yet cleared." *Tims v. LGE Cmty. Credit Union*, 935 F.3d 1228, 1235 (11th Cir. 2019) (citing Consumer Fin. Prot. Bureau, Supervisory Highlights 8 (Winter 2015), available at https://files.consumerfinance.gov/f/201503_cfpb_supervisory-highlights-winter-2015.pdf (last visited September 28, 2020)).  "Therefore, the 'available balance' can be much lower than the 'actual balance' in an account." *Salls v. Dig. Fed. Credit Union*, 349 F. Supp. 3d 81, 85 (D. Mass. 2018).

The Account Agreement does not explicitly specify which method ESL will use to determine a customer's account balance and assess overdrafts.  Plaintiff argues that the terms of the Account Agreement communicate that ESL will use the actual/ledger balance method to charge OD/NSF fees, but—in breach of the Account Agreement—ESL instead uses the available balance method, which causes customers to incur unexpected OD/NSF fees.  ESL counters that the terms of the Account Agreement clearly authorize it to use the available balance method.

Both parties point to various overdraft-related provisions of the Account Agreement which they insist clearly support their respective positions.

### 1.   The Disclosure Agreement

First, both parties rely on paragraph 29 of the Disclosure Agreement.  That paragraph provides in pertinent part as follows:

> ESL will not pay a check when funds are not <u>available</u> to cover it, and an overdraft fee will be assessed (refer to a Fee Schedule for the exact fee charged).  We are only required to make one determination of the *account balance*. If that determination <u>reveals insufficient available funds</u> to pay the check or other item and you have requested CheckOK, unless prohibited by law and in our sole discretion, we may honor the check or other item and transfer the amount of overdraft from [a savings account]; or if we have previously approved a Cash Reserve Account that is attached to your share draft account, we will honor checks drawn on *insufficient funds* and add the amount of the overdraft to your Cash Reserve Account up to your approved credit limit; or, we may honor checks, ESL Bill Pay transactions and reoccurring ACH debit transactions drawn on *insufficient funds* pursuant to our Courtesy Pay agreement (refer to the Courtesy Pay Section in this Agreement).  ESL is not required to send you prior notice before a check is returned for *insufficient funds.*

ECF No. 30-2 at 8 (emphasis added).[2]  ESL argues that the underlined terms indicate that it will use the available balance to charge OD/NSF fees.  But Plaintiff argues that the italicized terms omit the "available" qualifier and thus suggest that the actual balance will be used.

---

[2]  When quoting the Account Agreement, underlined text signifies terms that ESL relies on in support of its interpretation, while italicized text signifies terms that Plaintiff relies on.

The parties both also look to the Courtesy Pay section of the Disclosure Agreement, which describes ESL's overdraft payment service.  That section provides in pertinent part as follows:

**COURTESY PAY**

Pursuant to our commitment to provide valued service and benefits, we may pay checks or other items/transactions ("Item" or "Items"), which would cause your share draft account to have a *negative (or further negative) balance* (herein "overdraft"), pursuant to the terms and conditions of this Agreement.

The Courtesy Pay service is not a loan or other credit product and requires no application or credit approval process.  The Courtesy Pay service is for members and will only be applied to your share draft (checking) account(s), such as Free Checking and Premier Checking, if:

- You maintain your membership in good standing;

- Your share draft account was opened more than 60 days;

- Your share draft account was funded with at least $1.00 for a period not less than 30 days before the Item was presented to ESL for payment;

- Your loan and credit card accounts you have with us are current;

- Your share draft account is brought to a <u>positive end-of-day available balance</u> at least once every 20 days;

- There are no legal or administrative orders, including attachments, garnishments, or levies against your accounts with us;

- There are no pending bankruptcies or financial counseling arrangements;

- There is no *negative balance* on any other share account on which you are an owner;

- The primary accountholder is 18 years of age or older and the share draft account is not an account set up by a fiduciary.

**ANY SUCH PAYMENT WILL BE MADE ON A CASE BY CASE BASIS, AT OUR SOLE DISCRETION.** However, we shall not pay any item if your *negative checking account balance* is, or if we were to make payment pursuant to this Agreement would become, greater than $500 in a Free Checking Account or $1,000 in a Premier Checking Account including any applicable fees. . . .

ECF No. 30-2 at 13 (bolded text in original; italics and underlines added).  The very first sentence of the Courtesy Pay section is the closest the Disclosure Agreement comes to defining an overdraft.

Importantly, it omits the qualifier "available" and defines an overdraft as a payment that causes an

account to have a "negative balance."   While the underlined provision of this section uses the qualifier "available," the more numerous italicized provisions do not.

The parties also cite two separate Overdraft Options subparagraphs in different sections of the Disclosure Agreement, one of which uses the word "available" and one which does not.  ESL points to the Overdraft Options subparagraph relating to Simple Spending Accounts, which states that "[a]ny ATM, POS, ACH or Visa Check Card transaction initiated for an amount over your available account balance may be declined."  ECF No. 30-2 at 6 (emphasis added).  But Plaintiff looks to the Overdraft Options subparagraph relating to HSA accounts, which states that "if any transaction, fee or charge causes your HSA to have a *negative balance*, we will return the item and charge an insufficient funds fee (refer to a Fee Schedule for the exact fee charged)."  ECF No. 30-2 at 7.

ESL further asserts that the Disclosure Agreement's Funds Availability Policy communicates that ESL will use the available balance to charge OD/NSF fees because it warns customers that funds will not always be immediately available after being deposited.  ECF No. 30-2 at 10-11.  But the Funds Availability Policy only deals with deposits: it "only explains how there may be a delay on funds coming into a member's account."  *Salls*, 349 F. Supp. 3d at 88.  It does not explain that funds might not be available due to pending withdrawals, which could also affect a customer's "available balance."  *See id.*  Nor does the Funds Availability Policy define "available balance" or discuss overdrafts.  *See id.*  It therefore fails to link the concept of availability of funds to OD/NSF fees.

ESL also points out that paragraph 50 of the Disclosure Agreement explains that the way balances in checking accounts are internally classified as required by federal regulations will not affect a customer's "available balance."  ECF No. 30-2 at 11.  But this paragraph relates only to

internal classifications, not the customer-oriented determination of whether an overdraft or insufficient funds scenario has occurred.

### 2.   The EFT Agreement

Both parties also look to the EFT Agreement in an attempt to bolster their interpretations.

Most notably, the Service Charges section of the EFT Agreement sets forth when OD/NSF fees will be charged on different types of accounts.  That section provides, in part, as follows:

> **14. SERVICE CHARGES**
>
> **ESL ATM Card, ESL Visa Check Card & ESL Visa HSA Card** . . . .
>
> Any ATM, POS, ESL Visa Check Card or ESL Visa HSA Card transaction that clears against *insufficient funds* in your account at ESL will result in an OD/NSF fee for each transaction, regardless of the *account balance* indicated at the ATM, POS, or Visa terminal at the time you performed the transaction. Due to different computer updating processes, the *account balance* indicated at the ATM, POS, or Visa terminal may not always reflect the *actual balance* in your account at ESL. Refer to the Fee Schedule for fee amounts. . . .
>
> **ACH** Any AHC transaction that clears against *insufficient funds* in your account at ESL will result in an OD/NSF fee for each transaction according to the Fee Schedule."

ECF No. 31-2 at 67-68.  As the italicized text shows, this section does not use the term "available funds" or "available balance," in fact uses the term "actual balance."

Other portions of the EFT Agreement that discuss OD/NSF fees are inconsistent in their use of the "available" qualifier.  For example, within the section entitled Types of Available Electronic Transfers and Limits, a provision governing ESL's Online Bill Pay service says that, if a customer creates an overdraft on an electronic payment, "the ESL Online Bill Pay provider will attempt to collect funds up to three times, and an insufficient funds fee will be collected for each attempt where the funds are not <u>available</u> in the account."  ECF No. 31-2 at 58 (emphasis added).  But that same provision also explains that if a customer attempts "to send a Person to Person

Payment from an account with *insufficient funds*, the payment will be stopped." ECF No. 31-2 at 59.

ESL argues that the Posting and Timing of Transactions and Documentation of Transactions section of the EFT Agreement—like the Funds Availability Policy in the Disclosure Agreement—advises customers that deposits are not always immediately available, and that payments made with a customer's debit card will be made immediately unavailable for withdrawal. ECF No. 31-2 at 59-61. But like the Funds Availability Policy, this section does not link the concept of the availability of funds to OD/NSF fees.

### 3.  Analysis

As the provisions quoted above demonstrate, the Account Agreement uses the modifier "available" frequently—but it omits it just as often. Reading the Account Agreement as a whole, the Court concludes that it is ambiguous as to whether it contemplates the use of the available balance method or the actual/ledger balance method when charging OD/NSF fees.

The Court in *Ramirez v. Baxter Credit Union*, No. 16-cv-3765-SI, 2017 WL1064991 (N.D. Cal. Mar. 21, 2017), came to a similar conclusion. The *Ramirez* court explained that, like here, the

> Customer Agreements contain no provision specifying which method [the credit union] uses to determine a customer's balance for assessing overdrafts. Both parties put forth reasonable, opposing interpretations of the agreement. Defendant reasonably asserts that the Deposit Account Agreement's repeated use of "available balance," plus other contractual hints that the "available balance" is some subset of a customer's ledger balance, demonstrates that [the credit union] does not use a customer's ledger balance in assessing overdrafts. Plaintiff reasonably asserts that the agreement fails to define "available balance," or otherwise clearly indicate to a customer that her "available balance" is somehow different from her ledger balance. The Court cannot resolve this ambiguity on a motion to dismiss.

2017 WL1064991, at *5.

Other courts have upheld similar breach of contract claims at the dismissal stage.

For example, in *Gunter v. United Fed. Credit Union*, No. 3:15-cv-483-MMD, 2016 WL3457009, at *3 (D. Nev. June 26, 2016), the account agreement stated that the credit union could "honor withdrawal requests that overdraw [a customer's] account," and "charge fees for overdrafts." *Id.* The agreement went on to describe the Courtesy Pay service as allowing the credit union "to pay an item presented for payment against your checking account even if it causes the account to become overdrawn." *Id.* A different section of the agreement gave the credit union the right to "determine the amount of available funds in [a customer's] account for the purpose of deciding whether to return an item for insufficient funds at any time between the time [UFCU] receive[s] the item and when [UFCU] return[s] the item or send a notice in lieu of return." *Id.* Even though the agreement used the term "available" funds when discussing an insufficient funds scenario, the court concluded that the agreement was ambiguous because it did "not address how the credit union determines when an overdraft has occurred vis a vis the available funds in a customer's account." *Id.* It found that plaintiff's interpretation—that the actual balance should be used—was plausible and denied the credit union's motion to dismiss. *Id.*

In *In re TD Bank, N.A.*, 150 F. Supp. 3d 593 (D.S.C. 2015), one section of the account agreement stated that "[i]f your negative *available balance* exceeds $5 at the end of the day, we will charge you for each transaction that overdraws your account." *Id.* at 621 (emphasis supplied by *TD Bank*). But another section of the same agreement said that "[o]verdraft fees may be assessed on items presented for payment while the Account has a *negative balance*." *Id.* at 622 (emphasis supplied in TD Bank). Although the court indicated the plaintiff was selectively reading the contract in arguing that the bank did not use the term "available balance," it nevertheless denied the bank's motion to dismiss, finding that plaintiff's claim was plausible and survived the "minimal pleading bar" applicable at the motion to dismiss stage. *Id.* at 624.

In *Tims v. LGE Cmty. Credit Union*, 935 F.3d 1228 (11th Cir. 2019), one of the agreements between the credit union and the customer stated that "an overdraft occurs when you do not have enough money in your account to cover a transaction, but we pay it anyway." *Id.* at 1238 (brackets omitted). A second agreement stated that an overdraft occurs "if an item is presented without sufficient funds in your account to pay it" or "if funds are not available to pay all of the items." *Id.* (brackets omitted). The Eleventh Circuit reversed the district court and found that these provisions were ambiguous as to whether the credit union intended to use the available balance or the actual balance in assessing overdrafts. *Id.* at 1239. This was so even though, like here, the agreements contained a "Funds Availability Disclosure" that explained that deposited funds might not be immediately available and repeatedly used the word "available." *Id.; see also Salls*, 349 F. Supp. 3d at 88; *Bettencourt v. Jeanne D'Arc Credit Union*, 370 F. Supp. 3d 258, 263 (D. Mass. 2019) (both upholding similar claims on motions to dismiss).

ESL urges the Court to reject this authority and follow other cases which dismissed claims similar to the one here.

For example, in *Domann v. Summit Credit Union*, No. 18-CV-167-SLC, 2018 WL 4374076 (W.D. Wis. Sept. 13, 2018), the account agreement contained a Withdrawal Restrictions section and a Funds Availability Policy, both of which advised customers that transactions would only be made from available funds in their accounts and that transfers from insufficient available funds would trigger the overdraft protection plan or policy. *Id.* at *6. Additionally, the Overdrafts section of the agreement stated in part:

> If, on any day, the *available* funds in your share or deposit account are not sufficient to pay the full amount of a check, draft, transaction, or other item, plus any applicable fee, that is posted to your account, we may return the item or pay it, as described below. The Credit Union's determination of an insufficient *available account balance* may be made at any time between presentation and the Credit Union's midnight deadline with only one review of the account required. We do

> not have to notify you if your account does not have sufficient *available* funds in
> order to pay an item.

*Id.* (emphasis supplied in *Domann*).  The court in *Domann* found that that case was distinguishable

from cases that lacked a Funds Availability Policy, or that had such a policy, but did not use the

word "available" in discussing overdrafts.  *Id.* at *7.  It found that the provisions of the account

agreement, taken together, unambiguously communicated that the credit union would use the

available balance to assess overdrafts.  *Id.*  Here, though, the Funds Availability Policy does not

mention overdraft procedures or policies, and the first sentence of the Courtesy Pay section which

defines overdrafts does not use the word "available."

In *Chambers v. NASA Fed. Credit Union*, 222 F. Supp. 3d 1 (D.D.C. 2016), the relevant

agreement stated that an "overdraft occurs when you do not have enough money in your account

to cover a transaction, but we pay it anyway."  *Id.* at 10.  The parties disputed whether "enough

money" invoked the concept of an available balance or an actual balance.  The court resolved the

dispute by looking to a provision of the agreement that gave examples of when a customer might

not have "enough money" in her account, "such as when she 'inadvertently miscalculates her

available balance,' or 'when funds from a recent deposit are not available.'"  *Id.* (brackets omitted).

The court held that these examples made clear that the credit union would use the available balance

method in imposing overdraft fees.  *Id.*  The court also found support for this interpretation in the

agreement's Available Balances to Make Transactions section, which stated that an overdraft

would occur if a transaction "exceed[ed] the balance of available collected funds in the account."

*Id.* at 10-11.

Finally, in *Page v. Alliant Credit Union*, No. 19-CV-5965, 2020 WL 5076690, at *1 (N.D.

Ill. Aug. 26, 2020), the membership agreement contained the following relevant provisions:

> [7a]  Withdrawal Restrictions. We permit withdrawals only if your account has
> sufficient available funds to cover the full amount of the withdrawal or you have

an established overdraft protection plan. Checks or other transfer payment orders which are drawn against insufficient funds may be subject to a service charges as set forth in the Fee Schedule. If there are sufficient funds to cover some, but not all of your withdrawal, we may allow those withdrawals for which there are sufficient funds in any order at our discretion. We may refuse to allow a withdrawal in some situations, and will advise you accordingly[.]

. . . .

[8a] Overdraft Liability. If on any day, the funds in your savings account are not sufficient to cover checks, fees or other items posted to your account, those amounts will be handled in accordance with our overdraft procedures or by one of the overdraft protection plans outlined below.... Whether the item is paid or returned, your account may be subject to a charge as set forth in the Fee Schedule[.]

*Id.* at * 1.  Additionally, Section 8b, the Overdraft Protections section, stated: "If the amount of the item presented for payment exceeds the total available overdraft sources, the item will be returned as non-sufficient funds (NSF) and you will be charged applicable fees."  *Id.* at *4.  The membership agreement also had a Funds Availability Policy which explained a customer's ability to withdraw funds based on availability.  *Id.*  Reading all these provisions as a whole, the *Page* court concluded that the credit union unambiguously contracted to calculate overdrafts using the available balance method.  *Id.*

This Court is more persuaded by the cases that denied the motions to dismiss.  Despite ESL's use of the word "available" sporadically throughout the Account Agreement, the most relevant provision—the first sentence of the Courtesy Pay section which defines "overdraft"— references only a "negative balance."  And although the Funds Availability Policy section suggests that ESL does not make all funds in a customer's account immediately available, that section fails to link the concept of the availability of funds to the determination of whether an overdraft or insufficient funds scenario has occurred.  *See Walbridge v. Ne. Credit Union,* 299 F. Supp. 3d 338, 346 (D.N.H. 2018) ("To the extent the availability of funds is explained in the Disclosure Agreement, that section was not linked to the Opt In Agreement or to the parts of the Account

Agreement that discussed overdrafts. In addition, . . . [the credit union] relies on scattered references to available funds while using other terms that it does not define.").

In sum, ESL's failure to explicitly state which method it uses to determine overdrafts, its failure to include the term "available" in the definition of overdrafts, and its inconsistent use of the term "available" throughout the Account Agreement creates an ambiguity. While ESL's interpretation of the Account Agreement as promising to use the available balance method is reasonable, so is Plaintiff's competing interpretation. On a motion to dismiss, any ambiguity must be resolved in Plaintiff's favor. *Perks*, 444 F. Supp. 3d at 639–40 (citing *Subaru Distribs. Corp. v. Subaru of Am., Inc.*, 425 F.3d 119, 122 (2d Cir. 2005)). Accordingly, ESL's motion to dismiss on this ground is DENIED.

**B.      ESL's Practice of Charging Multiple OD/NSF Charge Per "Insufficient Funds Item"**

Plaintiff next claims that ESL breached the Account Agreement by charging more than one OD/NSF fee per "insufficient funds item." ECF No. 30 ¶¶ 45-59, 75-76. She alleges the following example as the basis for her claim. On November 23, 2018, Plaintiff attempted a $34.93 transfer to PayPal via an ACH transaction. *Id.* ¶ 32. ESL rejected payment of that transaction due to insufficient funds and charged Plaintiff a $37 OD/NSF fee. *Id.* ¶ 33. Six days later, on November 29, 2018, the same transaction was reprocessed for payment and ESL again rejected the transaction due to insufficient funds and charged Plaintiff another $37 OD/NSF fee. *Id.* ¶ 34. ESL coded the resubmission of the transaction on Plaintiff's bank statements as "RETRY PYMT," indicating that ESL understood this transaction to be another iteration of the same authorization for payment. *Id.* ¶ 35. One month later, on December 31, 2018, the same transaction was reprocessed for payment a third time, and again ESL rejected the transaction due to insufficient funds and charged Plaintiff a third $37 OD/NSF fee. *Id.* ¶ 36. ESL also coded this transaction as a "RETRY PYMT." *Id.* ¶

37.  In total, ESL charged Plaintiff $111 in OD/NSF fees on a single $34.93 PayPal transaction. *Id.* ¶ 38.

This claim turns upon the interpretation of the following provision found in the Courtesy Pay section of the Disclosure Agreement:

> An Overdraft/Insufficient Funds fee will be charged to your share draft account, in accordance with our Fee Schedule, for each overdraft Item that is cleared on your share draft account.  In addition, an Overdraft/Insufficient Funds fee will be charged by ESL for each "insufficient funds" item presented for payment and returned unpaid on a share draft account.

ECF No. 30-2 at 13.  The term "item" is not defined.

Plaintiff alleges that this language means that ESL may only charge one OD/NSF fee per "insufficient funds item," and defines an item as encompassing both the original transaction and any resubmissions.  ESL counters that it may charge an OD/NSF fee each *time* an "insufficient funds item" is presented for payment and return unpaid, and argues that each request for payment on an original transaction, and each subsequent resubmission, are separate items.  The Court finds that both parties' interpretations of this provision are reasonable and thus the provision is ambiguous.

Under Plaintiff's interpretation, "item" could reasonably refer to an original, customer-authorized transaction, which, no matter how many times it is resubmitted, is still the same transaction.  "Each item" would therefore refer to a single transaction and could only incur one fee.  By this reading, "presented for payment and returned unpaid" does not speak to how many times an item can incur a fee, but rather simply describes an "insufficient funds item" as one that is returned, as opposed to one that clears, as with an overdraft.  The interpretation is consistent with the construction of the first sentence, which describes an overdraft as an item that is cleared. Because an overdraft can inherently only occur one time—since once it clears, it will not be returned—that sentence does not speak to how many times an overdraft can occur per item.  *See*

*Coleman v. Alaska USA Fed. Credit Union*, No. 3:19-CV-0229-HRH, 2020 WL 1866261, *5 (D. Alaska Apr. 14, 2020) ("As defendant points out, nothing in the contract suggests that when an act can occur more than once, there cannot be a fee charged each time the act occurs. But, on the other hand, the fact that in some instances, the Account Agreement uses "item" to refer to an act that can only occur once does suggest that it is plausible that the contract is susceptible to two reasonable interpretations and thus may be ambiguous.").

ESL's opposing interpretation is also reasonable. The phrase "presented for payment and returned unpaid" could be considered superfluous unless it is interpreted as ESL suggests to mean that an OD/NSF fee will be charged "each time" an item is presented for payment and returned unpaid. *See generally Int'l Multifoods Corp. v. Commercial Union Ins. Co.,* 309 F.3d 76, 86 (2d Cir. 2002) (noting that courts should avoid contract interpretations that render any provisions superfluous). In other words, if the term "each insufficient funds item" inherently already encompasses multiple presentations and returns of a given transaction, the phrase "presented for payment and returned unpaid" would seem redundant unless it was meant to clarify that the same item could incur fees "each time" it was "presented for payment and returned unpaid."

But weighing against ESL's interpretation is the fact that ESL did not simply say that an OD/NSF fee could be charged "each time" an item is presented for payment and returned unpaid. The fact that an agreement "could have been drafted more clearly does not necessarily mean that it is ambiguous." *Gove v. Career Sys. Dev. Corp.*, 689 F.3d 1, 7 (1st Cir. 2012) (but finding the agreement ambiguous despite that acknowledgment). But it can still suggest so. *See generally, e.g.*, *Carolina First Bank v. Banque Paribas*, No. 99 CIV. 9002 (NRB), 2000 WL 1597845, at *5 (S.D.N.Y. Oct. 26, 2000) (stating that the contract-drafter's "strained reading is all the more suspect given that it could have clearly written its intention at the time.").

The Court has also considered the case law cited by the parties.

Plaintiff cites a number of cases in which state and federal courts across the country have denied motions to dismiss claims like the one here.  *See* ECF No. 48 at 1-2 (collecting cases). Most recently, the Southern District of New York upheld a "multiple fees per item" breach of contract claim because the definition of "item" was ambiguous.  *See Perks*, 444 F. Supp. 3d 635. In *Perks*, the bank's fee schedule said that it could charge an OD/NSF fee of $35 "per item."  *Id.* at 638.   The deposit agreement defined "item" to include, among other things, an "ACH transaction" and "any other instruction or order for the payment, transfer, deposit or withdrawal of funds" (the "catch-all phrase").  *Id.* at 638-39.  Like in this case, the plaintiff attempted to make an ACH transfer to PayPal, and when the bank rejected the transfer due to insufficient funds, it charged an insufficient funds fee.  *Id.* at 639.  A week later, PayPal resubmitted the same transaction for payment, and the bank again rejected it and charged another fee.  *Id.*

Like here, the plaintiff argued that the original ACH submission and all resubmissions constituted a single "item" and could therefore only incur a single insufficient funds fee, and the bank countered that it could charge a fee on each submission and resubmission.  *Id.*  The court held that the definition of "item" was ambiguous.  On the one hand, the term "ACH transaction" could refer to the original ACH submission and the catch-all phrase could refer to ACH resubmissions.  *Id.* at 640.  Under this interpretation, the submission and resubmission would be two separate items because they would fall under two separate categories under the definition of "item."  *Id.*  On the other hand, "ACH transaction" could refer to both the original submission and the resubmissions, while the catch-all phrase could refer to any other orders not previously listed. *Id.*  Under this interpretation, both the submission and resubmission would be a single item.  *Id.*

Here, the Account Agreement does not define "item" at all, and so it is even more ambiguous than the agreement in *Perks*.

> In *Coleman,* 2020 WL 1866261, the court considered the following provision:
>
> Nonsufficient Funds (NSF) Activity: If available funds are not in the account when a debit is presented for payment, and Overdraft Protection or Courtesy Pay are not available, the item will be returned unpaid. A fee will be assessed for each returned item.

*Id.* at *3.  Like here, the plaintiff argued that this language means that the credit union could impose only one fee per item, defining "item" as an "accountholder instruction for payment."  *Id.*  Where an accountholder only authorizes payment once—no matter how many times a merchant resubmits the payment—only one item exists.  *Id.*  The credit union, in contrast, considered each merchant-resubmission to be a separate item, so that each time a merchant presented a transaction for payment and the bank rejected it for insufficient funds, the bank could charge a fee.  *Id.*  The court found both interpretations to be plausible and denied the credit union's motion to dismiss.  *Id.* at *4.[3]

For its part, ESL contends that this Court should follow *Lambert v. Navy Fed. Credit Union*, No. 19-CV-103, 2019 WL 3843064 (E.D. Va. Aug. 14, 2019), which dismissed plaintiff's claim.  In that case, the credit union's contract allowed it to assess a fee for "each returned debit item."  *Id.* at *1.  Both parties agreed that an "item" was a "request or invitation for payment."  *Id.*

---

[3] The *Coleman* court also considered other arguments similar to those made here.  For example, both parties argued that the National Automated Clearing House Association ("NACHA") rules supported their interpretations of the account agreement.  *Id.* at *4.  The credit union maintained that the rules authorize a merchant to attempt payment up to three times after an accountholder initiates an ACH transaction, so in effect, an account holder does authorize each resubmission, making each resubmission a separate item.  *Id.*  The plaintiff contended that the NACHA rules require resubmissions to be coded as "RETRY PYMT" "entries," and that "entries" are deemed "items" under the rules.  *Id.*  Thus, plaintiff argued, a resubmission was just another request for payment of the original entry, not a new entry or item.  *Id.*  The court concluded that, while it could consider the NACHA rules on a motion to dismiss, no party had submitted a copy of them to the court, and the question of how the rules inform the interpretation of the account agreement was a matter for another day.  *Id.*

at *3.  And the contract defined "items" to include "ACH debits."  *Id.*  Thus, the court found that the contract unambiguously communicated that each ACH debit request for payment—including merchant resubmissions—constituted a separate item.  *Id.* at *3-4.

Here, in contrast, as noted above, the Account Agreement does not define "item" and the parties dispute its meaning.  *See Perks*, 444 F. Supp. 3d at 641 (declining to follow *Lambert* where the contract at issue did "not define 'item' as broadly as a request for payment"); *Coleman*, 2020 WL 1866261, at *5 (concluding that, because "other courts have found similar contractual language to be both unambiguous and ambiguous," *Lambert* and other "case law provides little guidance to this court on a motion to dismiss.").  The Court therefore finds the cases cited by Plaintiff to be more persuasive, especially since ambiguities must be resolved in Plaintiff's favor.  *Perks*, 444 F. Supp. 3d at 639–40.  Accordingly, ESL's motion to dismiss this claim is denied.

## II.     Breach of the Covenant of Good Faith and Fair Dealing Claims

Plaintiff also alleges that ESL breached the covenant of good faith and fair dealing.  "Under New York law, all contracts contain an implied covenant of good faith and fair dealing."  *Perks*, 444 F. Supp. 3d at 641 (citing *Fishoff v. Coty Inc*., 634 F.3d 647, 653 (2d Cir. 2011)).  "Where the contract contemplates the exercise of discretion, this pledge includes a promise not to act arbitrarily or irrationally in exercising that discretion."  *Id*. (quoting *Fishoff*, 634 F.3d at 653). "A claim for breach of the implied covenant 'will be dismissed as redundant where the conduct allegedly violating the implied covenant is also the predicate for breach of covenant of an express provision of the underlying contract.'"  *Id.* (quoting *Merryman v. J.P. Morgan Chase Bank, N.A*., No. 15-CV-9188, 2016 WL 5477776, at *11 (S.D.N.Y. Sept. 29, 2016)).

Here, Plaintiff's implied covenant claims are duplicative of her breach of contract claims: she alleges that ESL breached the implied covenant by charging fees in ways not permitted by the

Account Agreement. *See* ECF No. 30 ¶¶ 81, 83, 84. In fact, her breach of contract and breach of the implied covenant claims are all part of her "First Claim for Relief." ECF No. 30 at 16.

Plaintiff attempts to differentiate her implied covenant claim by alleging that ESL exercises its discretion to interpret the terms of the Account Agreement and charge fees in bad faith. But this "is simply a repackaging of [her] breach-of-contract theory." *Perks*, 444 F. Supp. 3d at 641 (dismissing implied covenant claims based on similar allegations—brought by some of the same attorneys—as in this case). "The implied covenant of good faith is directed to the parties' promised performances, not their interpretations of the contract." *Id.* Here, Plaintiff's claim that ESL uses its discretion to interpret the Account Agreement in bad faith is just another way of alleging that the agreement is ambiguous and Plaintiff objects to ESL's interpretation of it. Accordingly, her implied covenant claim is dismissed.

## III.   New York GBL § 349 Claim

"To state a claim under § 349, a plaintiff must allege: (1) the act or practice was consumer-oriented; (2) the act or practice was misleading in a material respect; and (3) the plaintiff was injured as a result." *Spagnola v. Chubb Corp.*, 574 F.3d 64, 74 (2d Cir. 2009). Here, Plaintiff alleges that ESL's acts were consumer-oriented because they affected all of its customers, that its acts were misleading because they were contrary to its contractual promises, and that Plaintiff was injured because her account was debited in violation of her agreements with ESL. ECF No. 30 ¶¶ 89-91.

ESL moves to dismiss this claim because it does not allege a loss independent of Plaintiff's breach of contract loss. Some courts have dismissed GBL claims when they are duplicative of breach of contract claims. *See Perks*, 444 F. Supp. 3d at 624; *Costoso v. Bank of Am., N.A.*, 74 F. Supp. 3d 558, 575 (E.D.N.Y. 2015) (dismissing § 349 claim because "the conduct of which [the

plaintiff] complains is essentially that the [d]efendant failed to satisfy its contractual duties, not that it concealed or misrepresented any contractual terms." (citation omitted)).  These cases relied upon an earlier line of cases which held that, "[a]lthough a monetary loss is a sufficient injury to satisfy the requirement under § 349, that loss must be independent of the loss caused by the alleged breach of contract."  *Spagnola v. Chubb Corp.*, 574 F.3d 64, 74 (2d Cir. 2009).

But *Perks* did not cite—and *Costco* was decided before—*Nick's Garage, Inc. v. Progressive Cas. Ins. Co.*, 875 F.3d 107, 125 (2d Cir. 2017).  In that case, the Second Circuit stated that no broad requirement of damages independent from breach of contract damages exists for GBL claims.  *Id.*  Rather, it explained that  New York courts found no GBL injury "where the plaintiffs alleged damages in the amount of the purchase price of their contracts, but failed to allege that defendants had denied them the services for which they contracted."  *Id.* (quoting *Orlander v. Staples, Inc.*, 802 F.3d 289, 302 (2d Cir. 2015)); *see, e.g., Sokoloff v. Town Sports Int'l Inc.*, 6 A.D.3d 185, 186 (N.Y. 1st Dep't 2004) (dismissing plaintiff's claim that defendant health club deceptively made the initiation fee nonrefundable and limited its liability, but did not allege that the defendant failed to deliver any services under the contract).

The Court is therefore declines to dismiss Plaintiff's GBL claim merely on the argument that it is duplicative of the breach of contract claim.  A GBL and breach of contract claim co-existed in *Nick's Garage.*  Accordingly, the Court denies ESL's motion to dismiss Plaintiff's GBL claim at this time.

## IV.     Preemption

Finally, ESL argues that Plaintiff's claims are preempted by federal law because "at bottom she is seeking to hold a federally chartered credit union liable for allegedly failing to adequately disclose its overdraft and insufficient funds practices[,] and '[t]he requirement to make particular disclosures falls squarely within the purview of federal banking regulation and is expressly preempted.'" ECF No. 31-3 at 24 (citing *Gutierrez v. Wells Fargo Bank, N.A.*, 704 F.3d 712, 725 (9th Cir. 2012)).

The Court need not engage in an extensive preemption analysis because it disagrees with ESL's characterization of Plaintiff's claims. Plaintiff is not alleging a failure to disclose. She is not attempting to dictate to ESL what fees it may charge, or how it may charge them, or what disclosures it may make, or hold it liable for charging "unfair" fees. *Cf. Whittington v. Mobiloil Federal Credit Union*, No. 1:16-CV-482, 2017 WL 6988193, at *11 (E.D. Tex. Sept. 14, 2017), *aff'd*, 2019 WL 5198474 (5th Cir. Oct. 15, 2019) (finding preemption where plaintiff "attempt[ed] to use a state consumer law to dictate to a federal credit union what fees it may charge and how it may charge them. . . . [,] essentially ask[ing] the court to declare that the manner in which [the credit union] operates its overdraft program is unconscionable and unlawful."). She is alleging that ESL disclosed its overdraft and insufficient funds practices in the Account Agreement but failed to abide by those practices in accordance with the agreement.

Courts have typically found that state law breach of contact claims like Plaintiff's here are not preempted. *See Lambert*, 2019 WL 3843064, at *2 ("[I]t is well established that state law claims regarding a federal credit union's failure to disclose certain fee practices or any perceived unfairness in the fee practices themselves are preempted. . . . On the other hand, it is equally well established that true breach of contract and affirmative misrepresentation claims are not federally preempted, even if the result of those claims may affect a federal credit union's fee disclosures.");

*In Re TD Bank*, 150 F. Supp. 3d at 618 ("The *Gutierrez* case . . . is silent as to the sufficient funds theory.  District courts that have considered this question appear to be unanimous in finding that state law claims based on the sufficient funds theory are not preempted."); *see also* ECF No. 36 at 29 (collecting cases).  Accordingly, the Court finds that Plaintiff's claims are not preempted and declines to dismiss them on this basis.

**CONCLUSION**

For the foregoing reasons, ESL's motion to dismiss, ECF No. 30, is GRANTED IN PART AND DENIED IN PART.  Plaintiff's breach of the implied covenant of good faith and fair dealing claim is DISMISSED.[4]  Plaintiff's breach of contract and GBL claims may proceed.

IT IS SO ORDERED.

Dated: September 30, 2020
       Rochester, New York

HON. FRANK P. GERACI, JR.
Chief Judge
United States District Court

---

[4] Plaintiff's complaint also included a third breach of contract theory, but Plaintiff has withdrawn it.  ECF No. 36 at 9.  Thus, that theory is also dismissed.